## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| W.R. GRACE & Co., *et al.*,[1] | : | |
| Reorganized Debtors | : | Case No. 01-01139 (KG) |
| | : | (Jointly Administered) |
| | : | |
| | : | |
| CONTINENTAL CASUALTY COMPANY | : | |
| and TRANSPORTATION INSURANCE | : | |
| COMPANY | : | |
| Plaintiffs, | : | Adv. Proc. No. 15-50766 (KJC) |
| v. | : | (Re: D.I. 8, 15, 25) |
| JEREMY B. CARR, *et al.*, | : | |
| Defendants. | : | |

### OPINION[2]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Continental Casualty Company and Transportation Insurance Company (collectively

"CNA") filed an adversary complaint (the "Complaint") seeking to enforce the Asbestos PI

Channeling Injunction that was established in the Debtor's confirmed plan of reorganization to

---

[1] The Reorganized Debtors are W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.) ("Grace") and W. R. Grace & Co. - Conn. (together, the "Reorganized Debtors"). The chapter 11 cases of Grace and 62 related entities (the "Debtors") were jointly administered pursuant to an order of this Court dated April 2, 2001 (D.I. 9). *See In re W. R. Grace & Co.,* 446 B.R. 96, 102 n.2 (Bankr. D. Del. 2011) (listing those 62 entities).

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. A bankruptcy court has jurisdiction to interpret and enforce its own prior orders. *Travelers Indem. v. Bailey,* 557 U.S. 137, 151, 129 S. Ct. 2195, 2205, 174 L.Ed.2d 99 (2009). "[T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),* 372 F.3d 154, 168-69 (3d Cir. 2004). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

1

prevent the Defendants from pursuing certain personal injury lawsuits brought against CNA in Montana state court (the "Montana Complaints" or the "Montana Claims").[3]  The Defendants have moved to dismiss this adversary proceeding (D.I. 8) (the "Motion to Dismiss"). CNA has moved for summary judgment (D.I. 15) (the "Summary Judgment Motion").[4]  The parties disagree about whether the Montana Claims fall within the scope of the Asbestos PI Channeling Injunction.  For the reasons set forth below, I conclude that the Montana Claims are enjoined by the Asbestos PI Channeling Injunction and, accordingly, I will deny the Defendants' Motion to Dismiss and grant CNA's Summary Judgment Motion.

## BACKGROUND AND UNDISPUTED FACTS

The Debtors manufactured and sold specialty chemicals and construction materials for more than a century and, in the 1970's, began to face asbestos-related lawsuits.[5]  "Those lawsuits were based on harm allegedly caused by a number of Grace's products and activities, including its operation of a vermiculite mine in Libby, Montana" (the "Libby Facility").[6] "Grace operated the mine from 1963 to 1990, and during that period the mining process released asbestos-containing dust into the atmosphere and allegedly sickened hundreds of area residents."[7]

Beginning in 1973, CNA issued commercial and general liability policies, umbrella policies, excess policies, and/or workers' compensation and employer liability policies to Grace,

---

[3] Sometimes the Defendants, who are the plaintiffs in the Montana Complaints, are referred to herein as the "Montana Claimants."

[4] In the Defendants' Opposition to CNA's Motion for Summary Judgment Combined with Reply Brief in Support of Defendants' Motion to Dismiss (Adv. D.I. 18), the Defendants agree that the Court should treat the Motion to Dismiss as a cross-motion for summary judgment. Fed. R. Civ. P. 12(d), made applicable hereto by Fed. R. Bankr. P. 7012.

[5] *In re W. R. Grace & Co.,* 729 F.3d 311, 314 (3d Cir. 2013).

[6] *Id.*

[7] *Id.*

including policies in connection with Grace's operation of the Libby Facility.[8]  Some of those

policies grant CNA the right to inspect the Libby Facility,[9] but also include language intended to

limit the legal effect of any inspections.[10]

On April 2, 2001, the Debtors filed voluntary chapter 11 petitions in this Court.  The

Debtors' First Amended Plan of Reorganization (the "Plan") took effect on February 3, 2014 (the

"Effective Date").[11]  The Plan was supported by the Debtors and the Court-appointed

representatives of the interests of existing and future asbestos claimants.[12]

---

[8] Statement of Undisputed Material Facts of Continental Casualty Company and Transportation Insurance Company in Support of Motion for Summary Judgment, ¶20 ("CNA's SUF") (Adv. D.I. 15-2) (citations omitted).  The Defendants' Counter-Statement of Disputed Material Facts (Adv. D.I. 20) confirmed that almost all of CNA's SUF were undisputed.  Any disputed facts, if pertinent, are noted herein.

[9] CNA's workers' compensation policies provided:
The Company … shall … be permitted but not obligated to inspect at any reasonable time the workplaces, operations, machinery and equipment covered by this policy. Neither the right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the insured or others, to determine or warrant that such workplaces, operations, machinery or equipment are safe or healthful, or in compliance with any law, rule or regulation.
CNA SUF ¶ 21.

[10] At least one of CNA's workers' compensation policies provided:
We have the right, but are not obliged to inspect your workplaces, at any time. Our inspections are not safety inspections. They relate to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards.
CNA SUF ¶ 22. CNA's primary comprehensive general liability policies generally provided:
The Company shall be permitted but not obligated to inspect the Named Insured's property and operations at any time.  Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Named Insured or others, to determine or warrant that such property or operations are safe.
CNA SUF ¶23.

[11] The Bankruptcy Court's confirmation of the Plan was affirmed on appeal by the District Court and the Court of Appeals for the Third Circuit. *In re W. R. Grace & Co.,* 446 B.R. 96 (Bankr. D. Del. 2011) *aff'd* 475 B.R. 34 (D. Del. 2012) *aff'd* 729 F.3d 311 (3d Cir. 2013).

[12] CNA SUF ¶ 1 (citing Plan §§ 1.1.36, 1.1.38 - 1.1.39, 1.1.173).

The Plan creates the "WRG Asbestos PI Trust" (the "Asbestos PI Trust"), "a Delaware statutory trust, established pursuant to section 524(g)[13] of the Bankruptcy Code and in accordance with the Asbestos PI Trust Agreement."[14]  Section 8.2 of the Plan provides that "[i]n order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code §§ 1141, 524(a) and 105 and as described in this Article 8, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 524(g), the Confirmation Order shall provide for issuance of the Asbestos PI Channeling Injunction to take effect as of the Effective Date."[15]

Section 8.2.1 of the Plan, entitled "Asbestos PI Channeling Injunction," provides, in pertinent part, that:

> On and after the Effective Date, the sole recourse of the Holder of an Asbestos PI Claim[16] or a Successor Claim arising out of or based on any Asbestos PI Claim on account thereof shall be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction and the Asbestos PI TDP [Trust

---

[13] Bankruptcy Code § 524(g)(1) provides, in part, that "a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction . . . to supplement the injunctive effect of a discharge." 11 U.S.C. § 524(g)(1). If certain requirements of § 524(g) are met, "the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization . . . is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products . . . ." 11 U.S.C. § 524(g)(2)(B).

[14] CNA SUF ¶ 2 (citing Plan § 1.1.43).

[15] Plan § 8.2.

[16] The Plan defines an "Asbestos PI Claim" as:
> a Claim ... or Demand against ... any of the Debtors or the Asbestos Protected Parties ... based on, arising out of, resulting from, or attributable to, directly or indirectly: (a) death, wrongful death, personal or bodily injury ... sickness, disease, loss of consortium, survivorship, medical monitoring, or other personal injuries ... or other damages ... and (b) the presence or exposure at any time to: (1) asbestos or any products or materials containing asbestos that were mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, supplied, produced, specified, selected, distributed, disposed of, installed by, or in any way marketed by, or on behalf of, one or more of the Debtors ... or (2) asbestos-containing vermiculite mined, milled or processed by the Debtors.... Notwithstanding the foregoing or anything else to the contrary, "Asbestos PI Claim" as defined herein does not include Worker's Compensation Claims....

CNA SUF ¶ 3 (citing Plan § 1.1.34).

Distribution Procedures] . . . . Without limiting the foregoing, from and after the Effective Date, the Asbestos PI Channeling Injunction shall apply to all present and future Holders of Asbestos PI Claims . . . and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any and all legal or other actions or making any Demand against any Asbestos Protected Party or any property or interest (including Distributions made pursuant to this Plan) in property of any Asbestos Protected Party for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any Asbestos PI Claims . . . other than from the Asbestos PI Trust in accordance with the Asbestos PI Channeling Injunction and pursuant to the Asbestos PI Trust Agreement and the Asbestos PI TDP . . . .[17]

The Plan defines an "Asbestos Protected Party" to include the "Settled Asbestos

Insurance Companies,"[18] which are defined as;

any Asbestos Insurance Entity[19] that has entered into an Asbestos Insurance Settlement Agreement;[20] *but* only with respect to, and only to the extent of, any Asbestos Insurance Policy (or any portion thereof) identified as the subject of an Asbestos Insurance Settlement Agreement in Exhibit 5 in the Exhibit Book . . . and *further provided*, for the avoidance of doubt that an Asbestos Insurance Entity is a Settled Asbestos Insurance Company to the fullest extent, but only to the extent provided by section 524(g) in respect of any claim that arises by reason of one of the activities enumerated in section 524(g)(4)(A)(ii).[21]

Under the Plan, an "Asbestos Insurance Policy" includes policies that provide "insurance

coverage for any Asbestos Claim" but an Asbestos Insurance Policy does not include Workers'

Compensation Claims.[22]

Exhibit 5 to the Plan includes CNA among the "Asbestos Insurance Entities which have

entered into an Asbestos Insurance Settlement Agreement."[23] CNA and Grace entered into a

---

[17] CNA SUF ¶15 (citing Plan §8.2.1).

[18] CNA SUF ¶ 4 (citing Plan § 1.1.51).

[19] The Plan defines an "Asbestos Insurance Entity" as "any Entity, including any insurance company, broker, or guaranty association, that has issued, or that has or had actual or potential liability, duties or obligations under or with respect to, any Asbestos Insurance Policy." CNA SUF ¶ 6 (citing Plan § 1.1.11).

[20] The Plan defines "Asbestos Insurance Settlement Agreement" as "any settlement agreement between or among any of the Debtors ... involving any Asbestos Insurance Policy ...." CNA SUF ¶ 7 (citing Plan § 1.1.16).

[21] CNA SUF ¶ 5 (citing Plan § 1.1.209 (emphasis in original)).

[22] CNA SUF ¶ 8 (citing Plan § 1.1.13).

settlement agreement on November 18, 2010.[24] Prior to 2010, CNA and Grace had engaged in

years of litigation over the scope of CNA's coverage of Grace's asbestos liabilities, including

those arising out of Grace's Libby Facility.[25]  Under the settlement agreement, CNA agreed to

contribute the "Settlement Amount" of $84 million over a period of six years to the Asbestos PI

Trust.[26]

In 2014, the Defendants filed seven actions in Montana against CNA (the "Montana

Complaints").[27]  Each of the Montana Complaints include the following allegations:

a.  Defendants "were Grace and Zonolite mine, mill or processing workers, independent contractors, loggers, homeowners, gardeners, recreators, ball field players, lumber mill workers, railroad workers, housewives/children of Grace workers, or community members of Libby, Montana."[28]

b.  "While many Plaintiffs [here, Defendants] had repeated or continuous exposure, each of the Plaintiffs' individual exposure is unique in time, location, form, and degree of asbestos contact, and as a result of which Plaintiffs have been diagnosed with asbestos disease."[29]

c.  "CNA, through Transportation Ins. Co. or Continental Casualty Co., was the workers' compensation insurance carrier for W. R. Grace" from July 1, 1973 to 1996.[30]

d.  "CNA's professional staff included industrial hygienists and medical doctors with expertise in occupational disease" and "CNA was well aware of the hazards of asbestos exposure."[31]

e.  "CNA undertook to provide industrial hygiene services for the benefit of Grace employees, their families, and the community."[32]

---

[23] CNA SUF ¶ 17 (citing Plan, Exhibit 5 at 7).
[24] CNA SUF ¶25. *See also* Main Case D.I. 25776.
[25] CNA SUF ¶24 (citing Decl. of Daniel P. Caswell,  ¶¶ 20-24, attached as Ex. 1 to CNA's Reply Memorandum in Support of the Debtor's Motion for an Order Approving the Settlement between Grace and CNA (Main Case D.I. 26048-1)).
[26] CNA SUF ¶29.  In their Counter-Statement of Disputed Material Facts, the Defendants object to CNA's summary of the CNA/Grace settlement agreement.  In my analysis of the issues before me, I do not rely on either party's summary of the settlement agreement, but on the document itself.
[27] CNA SUF ¶ 38.
[28] CNA SUF ¶ 39.c. (quoting Carr Compl. (Adv. D.I. 1, Ex. A) ¶ 26).
[29] CNA SUF ¶ 39.d. (quoting Carr Compl. ¶ 26).
[30] CNA SUF ¶ 39.e. (quoting Carr Compl. ¶ 155).
[31] CNA SUF ¶ 39.f. (quoting Carr Compl. ¶ 156).

f.      CNA had a duty of care "to the Libby workers, their families and to the community."[33]

g.      "CNA was negligent in its undertaking to provide services: (a) in failing to recommend or require sufficient measures and standards for employee education, warning the workers, their families and the community, protection against asbestos dust going into workers' homes and into the community, dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance) and medical monitoring; (b) in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust; (c) in failing to obtain medical information on the incidence of disease and deaths at the Grace operations from Grace and from public agencies; and (d) in failing to sufficiently study and use the information on dust control and asbestos disease that it did have."[34]

h.      "CNA's representatives with expertise in industrial hygiene inspected the Grace Libby operations."[35]

i.      CNA was negligent in inspection of the Grace Libby operations, in failing to report and act upon hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring."[36]

On June 8, 2015, CNA commenced this adversary proceeding by filing a complaint seeking declaratory judgment that the Montana Claims violate the Asbestos PI Channeling Injunction. The Defendants filed the Motion to Dismiss and CNA filed the Summary Judgment Motion.[37] The Court heard oral argument on the competing motions and took the matter under advisement.

---

[32] CNA SUF ¶ 39.g. (quoting Carr Compl. ¶ 159).
[33] CNA SUF ¶ 39.h. (quoting Carr Compl. ¶¶ 160, 163).
[34] CNA SUF ¶ 39.i. (quoting Carr Compl. ¶ 161).
[35] CNA SUF ¶ 39.j. (quoting Car Compl. ¶ 162).
[36] CNA SUF ¶ 39.k. (quoting Carr Compl. ¶ 164).
[37] The Asbestos PI Trust sought leave to file an *Amicus Curiae* brief in support of CNA's Summary Judgment Motion. *See* Adv. D.I. 25. The Defendants objected to that motion (Adv. D.I. 27), and the Asbestos PI Trust filed a response to the objection (Adv. D.I. 28). Although there is not a specific rule governing the filing of *amicus* briefs in adversary proceedings, it is helpful to note that § 1109(b) "has been construed to create a broad right of participation in Chapter 11 cases." *In re Combustion Eng'g*, 391 F.3d 190, 214 n. 21 (3d Cir. 2004). Based on the specific circumstances of this case, I conclude that it is appropriate to grant the Trust's request to file the *amicus* brief. The Trust has an adequate interest in

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable hereto by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38]  At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[39]

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[40]  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[41]  When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden."[42]

---

this matter since the outcome of this proceeding may affect the funds available to carry out the Trust's purpose, which is (among other things) to process, liquidate, pay and satisfy all Asbestos PI Claims. Further, an *amicus* brief is desirable in this case since the parties have been involved throughout the long history of this case, whereas the case was transferred to me after Judge Fitzgerald's retirement.  Finally, the *amicus* brief is clearly relevant to the issues in this adversary proceeding.  *Neonatology Associates, P.A. v. C.I.R.,* 293 F.3d 128, 131 (3d Cir. 2002) (granting a motion to file an amicus brief under Fed. R. App. P. 29(b) because the movant demonstrated (i) an adequate interest, (ii) desirability, and (iii) relevance).

[38] Fed. R. Civ. P. 56(a).

[39] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[40] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

[41] *Id.,* 477 U.S. at 323, 106 S.Ct. at 2553.

[42] *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."[43]    Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[44] or by relying on "conclusory allegations, improbable inferences and unsupported speculation."[45]  "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment."[46]

Substantive law determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit will preclude summary judgment."[47]  Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[48] The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.[49]

## III. DISCUSSION

CNA argues that the Defendants' pursuit of personal injury claims in Montana state court violates the Asbestos PI Channeling Injunction.  The Defendants disagree, arguing that the Channeling Injunction, as limited by § 524(g)(4), does not apply to their claims, which arise

---

[43] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

[44] *Sarko v. Penn-Del Directory Co.,* 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).

[45] *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

[46] *J. Geils Band*, 76 F.3d at 1251 (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

[47] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

[48] *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result.").

[49] *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2505 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

from CNA's own negligence, and which do not seek recovery from insurance policy proceeds.[50]

The Defendants also argue that their personal injury claims are protected by the exception to the

Asbestos PI Channeling Injunction for workers' compensation claims.  The first part of the

dispute lies in the language of Bankruptcy Code §524(g)(4).  The second part of the dispute

centers on language in the Plan that creates an exception in the Asbestos PI Channeling

Injunction for workers' compensation claims.

## A.    The limitations of Section 524(g)(4) do not prevent the Asbestos PI Channeling Injunction from applying to the Montana Claims

"Section 524(g) provides a special form of supplemental injunctive relief for an insolvent

debtor facing the unique problems and complexities associated with asbestos liability."[51]  As

further explained by the Third Circuit:

> Channeling asbestos-related claims to a personal injury trust relieves the debtor of
> the uncertainty of future asbestos liabilities. This helps achieve the purpose of
> Chapter 11 by facilitating the reorganization and rehabilitation of the debtor as an
> economically viable entity. At the same time, the rehabilitation process served by
> the channeling injunction supports the equitable resolution of asbestos-related
> claims. In theory, a debtor emerging from a Chapter 11 reorganization as a going-
> concern cleansed of asbestos liability will provide the asbestos personal injury
> trust with an "evergreen" source of funding to pay future claims. This unique
> funding mechanism makes it possible for future asbestos claimants to obtain
> substantially similar recoveries as current claimants in a manner consistent with
> due process. To achieve this relief, a debtor must satisfy the prerequisites set forth
> in § 524(g) in addition to the standard plan confirmation requirements.[52]

Subsection 524(g)(4) extends an asbestos channeling injunction in limited situations to

enjoin actions against non-debtors, providing in pertinent part:

---

[50] The Plan's definition of Settled Asbestos Insurance Company specifically provides that the injunction applies "only to the extent provided by § 524(g) in respect of any claim that arises by reason of one of the activities enumerated in § 524(g)(4)(A)(ii)." CNA SUF, ¶ 5 (citing Plan § 1.1.209).

[51] *In re Combustion Engineering, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004).

[52] *Id.*  (footnotes omitted).

Notwithstanding the provisions of section 524(e),[53] such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of--

. . . .

(III)    the third party's provision of insurance to the debtor or a related party . . . .[54]

The Asbestos PI Channeling Injunction identifies CNA by name and, by incorporating the CNA/Grace Settlement Agreement in Exhibit 5 to the Plan, includes all known and unknown policies issued to Grace by CNA, with certain exceptions, including an exception for workers' compensation claims (which is discussed in more detail below). Therefore, CNA is identifiable from the terms of the channeling injunction.

Whether the language of § 524(g)(4)(A) limits the scope of the Asbestos PI Channeling Injunction to bar the Montana Claims requires consideration of the following questions: (i) do the Montana Claims allege that CNA is directly or indirectly liable for the conduct of, claims against, or demands on, the Debtors, and (ii) does the liability alleged in the Montana Claims arise by reason of CNA's provision of insurance to the Debtors?

(1)    The Montana Claims seek to hold CNA "indirectly liable" for the Debtors' products or conduct.

The Defendants argue that the Montana Claims allege CNA is liable for its *own* negligent conduct, including the following: (i) CNA's actions or omissions in designing and implementing an inadequate industrial hygiene program, (ii) CNA's failure to conduct proper inspections, sampling and/or testing at the Libby Facility, and (iii) CNA's failure to warn the Montana Claimants of the danger of asbestos exposure. They assert these claims are independent of any claims against the Debtors. CNA argues in response that the Montana Claims seek recovery

---

[53] 11 U.S.C. §524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

[54] 11 U.S.C. §524(g)(4)(A)(ii)(III).

*indirectly* for injuries arising out of *Grace's* asbestos products or *Grace's* operations at the Libby Facility.

Section 524(g)(4) permits a channeling injunction to protect non-debtor third parties from law suits that are derivative of a debtor's conduct or claims against the debtors.[55] In *Combustion Engineering,* the Third Circuit noted that the asbestos-related personal injury claims asserted against the debtors' affiliates arose from "different products, involved different asbestos-containing materials and were sold to different markets,"[56] and were "wholly separate" from any liability involving the debtors.[57] The Court then determined that the § 524(g)(4)(A) channeling injunction did not protect the non-debtor affiliates.[58] In *Pittsburgh Corning,* the bankruptcy court determined that a § 524(g)(4)(A) injunction properly channeled claims against the debtors' affiliates that were based upon injuries caused by the debtor's products (known as "PC-Relationship Claims"), or were "conspiracy theory claims" based on joint and several liability theories with the debtor.[59] However, the court ruled that the *Pittsburgh Corning* channeling injunction had to be tailored to *exclude* claims against affiliates involving asbestos products that were not manufactured, marketed or sold by the debtor.[60]

Here, the injuries giving rise to the Montana Claims are based on exposure to *Grace's* asbestos products or operations at the Libby Facility. There are no allegations that CNA

---

[55] *Combustion Eng'g,* 391 F.3d at 235.
[56] *Id.* at 231.
[57] *Id.* at 235.
[58] *Id.*
[59] *In re Pittsburgh Corning Corp.,* 453 B.R. 570, 595-600 (Bankr. W.D. Pa. 2011). The *Pittsburgh Corning* Court defined "conspiracy theory claims" as claims alleging the affiliates were liable with the debtor based on allegations of conspiracy, alter ego, piercing the corporate veil, domination and control, concert of action, common enterprise, aiding and abetting, *respondeat superior,* negligent provision of services, principal and agent, successor in interest and other joint and/or several liability theories. *Id.* at 576
[60] *Pittsburgh Corning,* 453 B.R. at 595, 598, 600.

produced, mined, or marketed any of its own asbestos products.  Therefore, I conclude that the

Montana Claims seek to hold CNA indirectly liable for the Debtors' conduct and products.[61]

    (2)    <u>The Montana Claims allege that CNA's liability arises by reason of CNA's</u>
<u>provision of insurance to the Debtors</u>

Section 524(g)(4) provides that the channeling injunction protects a non-debtor third

party only to the extent that the direct or indirect liability "arises by reason of" a particular

relationship between the debtor and the third party.[62]  In this case, the relevant relationship is

---

[61] The Third Circuit interpreted similar language found in § 524(g)(1)(B) when considering the scope of the Asbestos PI Channeling Injunction on appeal of the order confirming the Debtors' Plan.  The State of Montana ("Montana") and Her Majesty Queen Elizabeth II in Right of Canada (the "Crown") argued that the Plan improperly channeled their contribution and indemnification claims against Grace to the Trust. *In re W.R. Grace & Co.*, 729 F.3d 311 (3d Cir. 2013).  Third-party plaintiffs sued Montana and the Crown for allegedly failing to warn their citizens of the risks posed by Grace's products and activities. *Id.* at 315.  Montana and the Crown argued that only personal injury, wrongful death and property damage actions should be subject to the channeling injunction.  The Third Circuit noted that § 524(g)(1)(B) expressly provided that a court can "enjoin entities from taking legal action for the purpose of *directly or indirectly* collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or part by a trust . . . ."  11 U.S.C. § 524(g)(1)(B) (emphasis added).  The Third Circuit decided that the contribution and indemnification claims were properly channeled to the Trust, writing:
> [B]ehind each failure-to-warn suit against Montana and the Crown is a plaintiff with a personal injury, wrongful death, or property damage claim against Grace.  More precisely, there must be such a plaintiff in order for Montana and the Crown to have a basis for their claims at all. Montana's and the Crown's actions against Grace therefore are brought "for the purpose of ... indirectly ... receiving payment or recovery" for asbestos-related personal injury and property damage claims against the debtor, and thus are subject to the § 524(g) channeling injunction under the plain language of that statute.

*Id.* at 324.  Similarly, here, behind each Montana Claim is a plaintiff with a personal injury, wrongful death or property damage against Grace.

[62] Section 524(g) extends the injunction to bar claims against a third party "to the extent such alleged liability of such third party arises by reason of--

    (I)    the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

    (II)    the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

    (III)    the third party's provision of insurance to the debtor or a related party; or

    (IV)    the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to--

        (aa)    involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

based on CNA's provision of insurance to the Debtors. There are no allegations that CNA has

any connection to the Debtors' products or operations, except as an insurer. The Montana

Complaints, however, assert that CNA breached certain duties that arise from that relationship

and the rights it reserved for itself as an insurer under the relevant insurance policies, including

improperly inspecting the Libby Facility, and failing to provide adequate industrial hygiene

services for the benefit of Grace's employees, their families and the community.[63]

At first blush, it seems clear that the Montana Claims against CNA fall within the plain

language and natural reading of the statute, i.e., the claims arise by reason of CNA's provision of

insurance to the Debtors. However, the Defendants rely on case law interpreting

§ 524(g)(4)(A)(ii) and argue: (i) this provision protects insurers only to the extent of the proceeds

of the policies issued by them; and (ii) the phrase "arises by reason of" requires the statutory

relationship at issue (here, the provision of insurance) to be a legal element of the claims against

the non-debtor. I conclude that these arguments have no merit here.

---

          (bb) acquiring or selling a financial interest in an entity as part of such a transaction.
11 U.S.C.A. § 524(g)(4)(A)(ii).

[63] More particularly, the Montana Complaint attached as Exhibit A to the adversary complaint (Montana Cause No. DDV-14-768) alleges that CNA was negligent in:

(a)     in failing to recommend or require sufficient measures and standards for employee education, warning the workers, their families and their community, protection against asbestos dust going into workers' homes and into the community, dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance and medical monitoring;

(b)     in failing to sufficiently test and monitor the effectiveness of dust control at all locations there was dust;

(c)     in failing to obtain medical information on the incidence of disease and deaths at the Grace operations from Grace and from public agencies; and

(d)     in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

The complaint further alleges that CNA negligently inspected the Libby operations "in failing to report and act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control . . . and insufficient medial monitoring."
(Adv. D.I. 1, Ex. A.) Similar claims are asserted in the additional complaints against CNA that are attached as exhibits to the Adversary Complaint.

Section 524(g)(4)(A)(ii) does not contain language limiting the third-party injunction to claims against insurance proceeds. The Defendants argue, however, that derivative liability involving the insurer/insured relationship embraces only claims collectable from an insurance policy. The Defendants' argument is based upon an abbreviated reading of a line of decisions in the *Johns-Manville* bankruptcy case.[64] Those cases considered, among other issues, whether an asbestos channeling injunction enjoined certain state court lawsuits against insurers who had settled with the debtors and were contributing funds to the personal injury settlement trust.[65] The Second Circuit recognized that the claimants' state court actions against the insurer did not seek to collect from the proceeds of the policies issued to the debtor.[66] The Second Circuit held that "[a] bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate."[67] The Court determined that the insurance policies issued to the debtor were the most valuable assets of the bankruptcy estate.[68] The Second Circuit then "held that the bankruptcy court's *in rem* jurisdiction was insufficient to allow it to enjoin

---

[64] *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),* 517 F.3d 52 (2d Cir. 2008) ("*Manville III*"), *rev'd sub nom. Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009), *on remand Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),* 600 F.3d 135 (2d Cir. 2010) ("*Manville IV*").

[65] Congress modeled § 524(g) after the channeling injunction issued in the *Johns-Manville* bankruptcy case. *Combustion Eng'g,* 391 F.3d at 235 n. 47 (citing 140 Cong. Rec. H10752, H10765 (1994)). Therefore the *Manville* cases are instructive in construing the requirements of § 524(g).

[66] *Manville IV,* 600 F.3d at 152 citing *Manville III,* 517 F.3d at 60 n. 17.

[67] *Manville IV,* 600 F.3d at 152 citing *Manville III,* 517 F.3d at 66. The District Court opinion in the *Manville* line of cases observed that "the Direct Action Suits [against Travelers] at issue here . . . do not seek the proceeds of the insurance policies or involve injuries from Manville products, but rather allege that Travelers breached its statutory duties or engaged in independent tortious conduct *in defending insureds other than Manville." In re Johns-Manville Corp.,* 340 B.R. 49, 63 (S.D.N.Y. 2006) (emphasis added).

[68] *Manville IV,* 600 F.3d at 152. Similarly, here, the insurance policies and proceeds were valuable assets of the Debtors' estates. *W.R. Grace,* 475 B.R. at 81-82.

Direct Actions based on state-law legal theories that seek to impose liability on [the insurer] as a

separate entity rather than on the policies that it issued to [the debtor]."[69]

Accordingly, a bankruptcy court's injunction can reach only as far as its jurisdictional

limits, but the inquiry is not limited to whether a claim seeks to collect proceeds of a debtor's

insurance policy.  The broader inquiry must be whether the third-party non-debtor claims affect

the *res* of the bankruptcy estate.[70]  "One of the central purposes - - perhaps *the* central purpose - -

of extending bankruptcy jurisdiction to actions against certain third parties, as well as suits

against debtors themselves, is to 'protect[] the assets of the estate' so as to ensure a fair

distribution of those assets at a later point in time."[71]  In this case, there is an express agreement

giving rise to indemnification obligations owed by the Debtors to CNA arising from any

judgment or settlement payable by CNA on an Asbestos-Related Bodily Injury Claim that is not

channeled to the Trust.[72]  The definition of Asbestos-Related Bodily Injury Claims includes:

> Claims based on or arising out of the CNA Companies' alleged undertakings or
> duties to provide industrial hygiene, medical, or other loss control services, to
> conduct inspections, sampling, testing, or medical examinations, to provide

---

[69] *Manville IV,* 600 F.3d at 152.  The insurer, Travelers, admitted that the state-law actions were unrelated to the policy proceeds. *Manville III,* 517 F.3d at 63.  The Supreme Court reversed *Manville III,* on narrow grounds in *Travelers Indem. Co. v. Bailey,* holding that the jurisdictional issue was not subject to collateral attack, stating that "once the 1986 Orders [which confirmed the debtors' plan and approved the insurance settlement agreements] became final on direct review (whether or not proper exercises of bankruptcy court jurisdiction and power), they became res judicata to the 'parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" *Bailey,* 557 U.S. at 152, 129 S.Ct. at 2205, quoting *Nevada v. United States,* 463 U.S. 110, 130, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983).  On remand to consider whether Chubb Indemnity Insurance Company was bound by the 1986 Orders (and deciding that Chubb was not), the Second Circuit noted that "[t]he *Bailey* Court did not contradict the conclusion of our jurisdictional inquiry." *Manville IV,* 600 F.3d at 152.

[70] The Second Circuit later remarked that "the salience of *Manville III's* inquiry as to whether Travelers' liability was derivative of the debtor's rights and liabilities was that, in the facts and circumstances of *Manville III,* cases alleging derivative liability would affect the *res* of the bankruptcy estate, whereas cases alleging non-derivative liability would not." *In re Quigley Co., Inc.,* 676 F.3d 45, 56-57 (2d Cir. 2012).

[71] *Quigley,* 676 F.3d at 57 (quoting *In re Zarnel,* 619 F.3d 156, 171 (2d Cir. 2010)).

[72] *See* Appendix to Defendants' Opposition to CNA's Motion for Summary Judgment (Adv. D.I. 19), Ex. 4, Settlement Agreement, § VII.D (the "Settlement Agreement").

warnings or educational services, shower facilities, protective clothing or
protective equipment, or otherwise to undertake actions to educate, warn, or
protect third parties about or from the dangers of exposure to asbestos or asbestos-
containing vermiculite.[73]

To the extent that CNA incurs any liability arising out of the Montana Claims, any

required indemnification by the Debtors will affect the *res* of the Debtors' estates, i.e., the

Settlement Amount being paid by CNA to the Asbestos PI Trust in accordance with the court-

approved Settlement Agreement and Plan.[74]  The Montana Claims are based (albeit indirectly)

only on Grace's products and conduct; there is no need for the intervention of additional lawsuits

to establish potential indemnification liability.[75]

Moreover, encouraging insurers to contribute to a debtor's trust also affects the *res* of the

estate.  Granting a § 524(g)(4)(A)(ii)(III) channeling injunction provides insurers with an

incentive to contribute to a debtor's trust in exchange for finality.[76]  Statements by Senator

Graham found in the legislative history of this Bankruptcy Code section underscore this purpose:

---

[73] Settlement Agreement, § I.J.

[74] Settlement Agreement, § II.C.  The Defendants point out that the Settlement Agreement caps
the indemnification obligation in § VII.D at $13 million and argue that the amount has been depleted.  In
the *amicus* brief, the Asbestos PI Trust asserts that at least $4.5 million of potential indemnification
obligations remain. I could find nothing in the factual record to support either assertion.  But, whether the
potential for indemnification liability remains does not alter this outcome.  Otherwise, whether the
channeling injunction applies to a third-party claim against the insurer would vary depending on the
timing of the third-party claim.   I am reluctant to apply a rule, the effect of which would cause
discrimination among similarly situated third-party claims, based solely on the timing of when the claim
is made.

[75] *Combustion Eng'g*, 391 F.3d at 231-32 (deciding that there was no "related to" jurisdiction
over independent non-derivative claims that arose from non-debtor products, involving non-debtor
asbestos-containing materials, sold to different markets and there was no evidence of direct liability for
potential indemnification claims, which would have to be established by the intervention of another
lawsuit.) *See also In re Federal-Mogul Global, Inc.,* 300 F.3d 368, 382 (3d Cir. 2002); *Pacor, Inc. v.
Higgins,* 743 F.2d 984 (3d Cir. 1984) *overruled on other grounds by Things Remembered, Inc. v.
Petrarca,* 516 U.S. 124, 134-35, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995).

[76] In *Plant Insulation*, the Ninth Circuit considered appeals by non-settling insurers to
confirmation of a plan that included a §524(g) trust and channeling injunction.  The Ninth Circuit noted
that the bankruptcy court "found that in order to persuade insurers to settle, they need to be able to obtain
finality from the settlement. Without this feature, Settling Insurers would always be exposed to indirect
asbestos liability through contribution suits.   There would never be finality, the Trust would be
underfunded, and asbestos claimants would continue to suffer from the vagaries of the tort system."

To those companies willing to submit to the stringent requirements in this section designed to ensure that the interests of asbestos claimants are protected, **the bankruptcy courts' injunctive power will protect those debtors and certain third parties,** *such as their insurers,* **from future asbestos product litigation of the type which forced them into bankruptcy in the first place.**

. . . .

By providing a trust to pay claims and an injunction channeling the present and future asbestos claims to that trust, the debtor and third parties who are alleged to be liable for the asbestos claims against the debtor will be encouraged to participate in a system that will maximize the assets available to pay asbestos claims, present and future, and provide for an equitable distribution and method of payment.[77]

The Montana Claims seek additional and alternative forums for Asbestos PI Claims arising out of *Grace's* products and conduct. While I am sympathetic that individuals may have suffered serious injuries, the purpose of the Asbestos PI Trust is to ensure that there is a fund available to compensate the victims, as well as future claimants, while also providing finality to insurers who contribute the trust. I conclude that applying the § 524(g)(4) injunction to bar the Montana Claims is consistent with this Court's jurisdiction, as well as the plain language and legislative history of the statute. Limiting a §524(g)(4)(A)(ii)(III) injunction to insurance proceeds it too attenuated.

The Defendants also argue that CNA's alleged liability for the Montana Claims does not arise *by reason of* CNA's provision of insurance to Grace because the connection between CNA's provision of insurance and the claims is factual, not legal. The Defendants rely upon a Second Circuit decision, *Quigley,* in which the court concluded that "the phrase 'by reason of,'

---

*Fireman's Fund Ins. Co. v. Onebeacon Ins. Co. (In re Plant Insulation Co.),* 734 F.3d 900, 909 (9th Cir. 2013). While the Ninth Circuit ultimately remanded the case because the trust did not comply with all of the § 524 requirements, the Court approved the bankruptcy court's determination regarding the § 524(g)(4) injunction, stating that "in light of the purposes of § 524(g), enjoining the Non–Settling Insurers' contribution claims was "fair and equitable" to future asbestos plaintiffs and, in providing the finality and protection from future suit, supplied the necessary incentive for insurers to settle in the first place. This inquiry sufficiently satisfies the statutory scheme." *Id.* at 913.

[77] 140 Cong. Rec. S4521-01, S4523, 1994 WL 139961 (daily ed. Apr. 20, 1994) (emphasis added).

as employed in 11 U.S.C. § 524(g)(4)(A)(ii), requires that the alleged liability of a third party for the conduct of or claims against the debtor arises, in the circumstances, as a legal consequence of one of the four relationships between the debtor and the third party enumerated in subsections (I) through (IV)."[78]

In *Quigley*, the court decided that a preliminary injunction, which tracked the language of §524(g)(4)(A)(ii), did not cover claims alleging that the debtor's parent corporation was liable as an "apparent manufacturer" of the debtor's asbestos products, since the parent's name and logo appeared on those products.[79] The parent corporation argued that it would not have applied its name and logo to the products absent its ownership interest in the debtor; therefore, liability would not arise "but for" the factual relationship between the parent and debtor. The court rejected this argument, deciding that the parent's ownership of the debtor was "legally irrelevant" to the apparent manufacturer claims.[80]

The *Quigley* court noted that "[s]ection 524(g) does not explicitly indicate whether the phrase 'by reason of' refers to legal or factual causation, or some combination of the two."[81] However, the court recognized that "[e]ach of the four relationships enumerated in subsections (I) through (IV) . . . is a relationship between one party and another that, in appropriate circumstances, has commonly given rise to the liability of the one party for the conduct of or claims or demands against the other, long before § 524(g) came into being."[82] Moreover,

> Section 524(g) is designed to "facilitat[e] the reorganization and rehabilitation of the debtor as an economically viable entity," as well as "make[ ] it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants." *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 234 (3d Cir. 2004). Needless to say, barring the prosecution of claims bearing only an accidental

---

[78] *Quigley*, 676 F.3d at 62. *See* n. 62, *supra.*
[79] *Id.* at 60.
[80] *Id.*
[81] *Id.*
[82] *Id.* at 61.

nexus to an asbestos bankruptcy is less than tangentially related to that objective.
. . . "The test for determining whether litigation has a significant connection with
a pending bankruptcy [sufficient to confer bankruptcy jurisdiction] is whether its
outcome might have any conceivable effect on the bankrupt estate." . . . We are
unpersuaded that Congress intended with its use of the phrase "by reason of" to
produce the peculiar results and jurisdictional difficulties that [the parent's]
construction of this phrase would bring about.[83]

Thus, the *Quigley* court's "relationship" analysis also addresses the jurisdictional concerns of

utilizing § 524(g)(4) to protect non-debtor third parties with an overly broad injunction. I have

already concluded that the Montana Claims would affect the *res* of Grace's bankruptcy estate.

In this matter, the Defendants argue that CNA's insurance policies are not legally

relevant to their claims which, they assert, arise under Section 324A of the Restatement (Second)

of Torts, which provides:

One who undertakes, gratuitously or for consideration, to render services to
another which he should recognize as necessary for the protection of a third
person or his things, is subject to liability to the third person for physical harm
resulting from his failure to exercise reasonable care to protect his undertaking, if
    (a)    his failure to exercise reasonable care increases the risk of such
        harm, or
    (b)    he has undertaken to perform a duty owed by the other to the third
        person, or
    (c)    the harm is suffered because of reliance of the other or the third
        person upon the undertaking.[84]

I disagree with the Defendants' assertion that CNA's provision of insurance to the

Debtors is not legally relevant to the Montana Claims, or that there is only some accidental nexus

---

[83] *Id.* at 61-62 (quoting *Publicker Indus., Inc. v. U.S. (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2ᵈ Cir. 1992)).

[84] Restatement (Second) of Torts § 324A (1965, update through June 2016). *But see Sheridan v. NGK Metals Corp.,* 609 F.3d 239 (3d Cir. 2010) (deciding that consulting firm under contract with owners of a manufacturing plant to test, analyze, and monitor levels of beryllium, and report their results to the owners was not liable under § 324A for failure to warn community members of harmful beryllium exposure because the consulting firm did not undertake a responsibility to warn and, further, did not negligently perform its contractual duties to the owner).

between the two. The basis for the alleged undertakings by CNA (i.e., industrial hygiene services or inspections of Grace's facilities) arise wholly out of the insurance relationship.

Accordingly, I conclude that the Asbestos PI Channeling Injunction, which incorporates the provisions of Bankruptcy Code § 524(g)(4)(A)(ii), enjoins the Montana Claims.

**B.    The Montana Claims do not fall within the exception in the Asbestos PI Channeling Injunction for workers' compensation claims**

The Defendants also argue that the Montana Claims arise from CNA's provision of workers' compensation insurance to the Debtors and the Asbestos PI Channeling Injunction does not enjoin claims under a worker' compensation policy.

According to the CNA/Grace Settlement Agreement, "Subject Policies" entitled to § 524(g) protection include:

> all known and unknown policies, or portions of policies, issued to [Grace] by any of the CNA Companies, … with a policy period or term incepting prior to June 30, 1985 … and that actually or potentially provide insurance coverage for any Asbestos-Related Claims; *provided however*, that "Subject Policies" does not include any rights or obligations under any insurance policy or settlement agreement to which any of the Grace Parties are a party *to the extent, but only to the extent*, that such rights or obligations pertain solely to coverage for ***Workers' Compensation Claims*.**[85]

Similarly, under the Plan, an "Asbestos Insurance Policy" includes policies that provide "insurance coverage for any Asbestos Claim," but does not include Workers' Compensation Claims.[86] The Plan defines "Workers' Compensation Claims" as:

> any Claim: (i) for benefits under a state-mandated workers' compensation system, which a past, present, or future employee of the debtors or their predecessors is receiving, or may in the future have a right to receive and/or (ii) for reimbursement brought by any insurance company or state agency as a result of payments made to or for the benefit of such employees under such a system and

---

[85] Settlement Agreement § I.PP (emphasis added).
[86] CNA SUF ¶ 3 (citing Plan § 1.1.13).

21

fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims.[87]

The exception is for Workers' Compensation *Claims,* not workers' compensation policies. The Defendants are not asserting that the Montana Claims include workers' compensation claims.

The Defendants also argue that allowing channeling injunctions under § 524(g)(4) to protect workers' compensation insurers unreasonably preempts state police powers. Workers' compensation laws are part of a state's "comprehensive regulatory scheme[] whose purpose is to improve work-place safety and health and to compensate employees for those injuries and illnesses that originate on the job, in part by ensuring the availability of funds for this purpose over a period of each state's determination."[88] In *Irving Tanning,* the court determined that the scope of preemption permitted in a plan under § 1123(a) did not apply to nonbankruptcy laws that are concerned with protecting public health, safety and welfare.[89] The Asbestos PI Channeling Injunction carefully excluded workers' compensation claims. It does not interfere with coverage for, or payment of, workers' compensation claims.


## V. CONCLUSION

In conclusion, the Montana Claims are subject to the Asbestos PI Channeling Injunction. CNA is entitled to summary judgment because (1) the Defendants are seeking to hold CNA "directly or indirectly" liable for the conduct of and claims against Grace; (2) CNA's alleged liability arises by reason of CNA's provision of insurance to Grace; and (3) the Defendants'

---

[87] CNA SUF ¶9 (citing Plan § 1.1.230).

[88] *Irving Tanning Co. v. Maine Superintendent of Ins. (In re Irving Tanning Co.),* 496 B.R. 644, 665 (B.A.P. 1st Cir. 2013).

[89] *Id.* at 664 (citing *Federal-Mogul,* 684 F.3d at 381).

claims against CNA are not workers' compensation claims that are excluded from the channeling injunction.

An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:   October 17, 2016