## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **W.R. GRACE & CO.,** *et al.,* | : | **Bankruptcy No. 01-1139 (AMC)** |
| | : | **(Jointly Administered)** |
| | : | |
| **DEBTORS** | : | **Adv. Proc. No. 15-50766 (AMC)** |
| | : | |
| | : | |
| **CONTINENTAL CASUALTY CO.,** *et al.,* | : | |
| | : | |
| **PLAINTIFFS** | : | |
| | : | |
| *v.* | : | |
| | : | |
| **JEREMY B. CARR,** *et al.,* | : | |
| | : | |
| **DEFENDANTS** | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

# CONTENTS

I.    Introduction ........................................................................................................1

II.   Background ........................................................................................................7

III.  Discussion ........................................................................................................13

    **A.** Derivative Liability ....................................................................................13

        **1.** Derivative Liability in *Tronox* ..............................................................14

        **2.** Derivative Liability Analysis in *Quigley* ................................................19

        **3.** Derivative Liability in the *Johns-Manville* Bankruptcy Cases ................20

            **a.** *Johns-Manville* Historical Background .........................................20

            **b.** *MacArthur* ....................................................................................23

            **c.** *Manville III* ...................................................................................25

            **d.** *Manville IV* ...................................................................................32

        **4.** *Quigley* Factual Background ..................................................................36

        **5.** *Quigley* Analysis of Derivative Liability Issues in
           *Johns-Manville* Cases ............................................................................37

IV.  Analysis of Montana Claims and Derivative Liability ...............................40

    **A.** Negligence and Breach of Duty to Warn Claims .................................41

V.   Jurisdictional Observations ..............................................................................46

VI.  Statutory Relationship ...................................................................................52

    **A.** Statutory Relationship ..............................................................................52

        **1.** *Quigley* Analysis .....................................................................................54

        **2.** Montana Law ..........................................................................................55

VII. Conclusion ......................................................................................................56

# I.    INTRODUCTION

At issue in this case is the scope of a channeling injunction created under § 524(g) of the Bankruptcy Code, which is designed to enjoin certain types of third-party claims in asbestos bankruptcy cases. Section 524(g) was modeled on the injunction issued in the *Johns-Manville* bankruptcy case to handle the unique complexities associated with asbestos litigation. In that case, the debtor faced crushing litigation filed by individuals who were injured by the debtor's asbestos. In addition, given the decades-long latency period for asbestos-related diseases, there were numerous potential claimants who had not yet been identified. At the same time, the debtor was embroiled in complex litigation with its insurers over its most valuable asset- the debtor's insurance policies.

In order to provide a resolution which would fairly treat current and potential claimants injured by the debtor's asbestos, the bankruptcy court crafted an injunction which "channeled" current and future claims into a trust. The trust became the sole source of recovery for the claimants and was funded by the debtor, its insurers, and its affiliates. In order to incent these parties to fund the trust, the bankruptcy court entered an injunction which enjoined, *inter alia*, certain types of third-party claims against the debtor's insurers.

At the time that the injunction was approved by the bankruptcy court, the parties agreed that the injunction would only enjoin derivative litigation, such as claims seeking recovery from the debtor's insurance policies which constituted part of the *res* of the debtor's bankruptcy estate and over which the bankruptcy court had jurisdiction. The parties agreed that the injunction would have no effect on nonderivative litigation, such as third-party tort claims filed against the debtor's insurers which were not part of the debtor's bankruptcy estate and over which the bankruptcy court had no jurisdiction.

1

Over the course of the *Johns-Manville* bankruptcy case, the Second Circuit developed a "derivative liability inquiry" which was used to determine whether a claim was derivative and would be channeled to the bankruptcy trust. Claims deemed nonderivative were beyond the jurisdiction of the bankruptcy court and could be litigated outside of the bankruptcy proceeding.

Under the derivative liability inquiry, a claim was deemed derivative if it was based upon allegations of the debtor's misconduct, not the insurer's misconduct, and if the claim affected the debtor's *res,* such as the debtor's insurance policy. The Second Circuit further refined the derivative liability inquiry in *Manville III*[1] by looking beyond the factual origins of a plaintiff's injury and determining whether the insurer owed a duty to the claimant under state law which was independent of the insurer's contractual duties to the debtor under its insurance policy. If the insurer owed a separate duty to the claimant, such claim would be deemed nonderivative and beyond the reach of the bankruptcy court. Although *Manville III* was reversed by the Supreme Court on grounds unrelated to this analysis, the Second Circuit repeatedly has upheld its analysis related to the derivative liability inquiry in subsequent cases. In *Manville IV,*[2] the Second Circuit confirmed that the bankruptcy court only has *in rem* jurisdiction over the debtor's insurance policies and does not have *in personam* jurisdiction over the debtor's insurers.

Congress subsequently used the *Johns-Manville* injunction as a model when it enacted § 524(g) of the Bankruptcy Code. There are two requirements of § 524(g)(4)(A)(ii) which are at issue in this case: the derivative liability requirement and the statutory relationship requirement. With regard to the derivative liability requirement, the court must determine whether certain tort claims filed by plaintiffs in state court against Continental Casualty Company and Transportation

---

[1] *Johns–Manville Corp. v. Chubb Indem. Ins. Co.* ("*Manville III*"), 517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds sub nom. Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009).

[2] *Johns–Manville Corp. v. Chubb Indem. Ins. Co.* ("*Manville IV*"), 600 F.3d 135 (2d Cir. 2010).

Insurance Company (collectively, "CNA") are derivative claims. With regard to the statutory relationship requirement, the court must determine whether CNA's provision of insurance to W.R. Grace & Co. ("Grace") is legally relevant to the elements of the tort claims. If CNA satisfies both requirements, then the tort claims will be enjoined pursuant to § 524(g)(4)(A)(ii) and channeled to the debtor's bankruptcy trust. If CNA fails to establish either of these requirements, then the tort claims may proceed in state court.

In analyzing the derivative liability requirement, the court also considers caselaw that was developed outside of the context of asbestos cases which generally addresses derivative claims in bankruptcy proceedings. In determining whether a claim is derivative, these cases consider whether a claim is based upon rights derivative of, or derived from, the debtor's rights. If a claim is deemed derivative under this analysis, the claim constitutes property of the estate and only the debtor (or a trustee) may pursue it for the benefit of all the debtor's creditors in the bankruptcy proceeding.

On remand in this case, the Third Circuit relied upon the framework set forth in *Quigley*[3] for determining when a claim is derivative, and instructed this court to focus on whether CNA owed a duty to the plaintiffs which was independent of its contractual duties to Grace under the insurance policies that CNA issued to Grace ("CNA Policies"). In *Quigley*, the Second Circuit also addressed the issue of jurisdiction, noting that, although the derivative liability inquiry is used as a tool by courts to determine whether a court has jurisdiction over a claim, it is not a requirement that must be satisfied before a court determines that it has jurisdiction. The Second Circuit recognized that the standard for determining jurisdiction (whether the outcome of litigation will have a conceivable effect on the bankruptcy estate) is broader than the derivative

---

[3] *In re Quigley Co., Inc.* ("*Quigley*"), 676 F.3d 45 (2d Cir. 2012).

liability inquiry (whether the litigation is based upon the debtor's conduct and affects the *res* of the bankruptcy estate). As a result, bankruptcy courts always have jurisdiction over derivative claims, but rarely have jurisdiction over those that are nonderivative.

Based upon the foregoing, the following diagram provides a framework for distinguishing derivative claims from nonderivative claims:



In the bankruptcy context, if a plaintiff's claim against a third party is based upon: (1) the plaintiff's claim against a debtor (the debtor's liability); and (2) the debtor's claim against the third party (the third party's liability to the debtor), then the plaintiff's claim is derivative. On the other hand, if a plaintiff's claim against a third party is not based upon the debtor's liability and the third party's liability to the debtor but, rather, an entirely independent claim held by the plaintiff directly against the third party, then the plaintiff's claim is nonderivative. This diagram is consistent with § 524(g)(4)(A)(ii), which enjoins third party derivative claims defined as claims against a third party who is alleged to be (directly or indirectly) liable for either the debtor's conduct or a claim against the debtor.

4

This model also demonstrates why fraudulent transfer, alter ego/veil piercing, and direct action claims are derivative claims. In the fraudulent transfer context, a creditor's claim against the recipient of a fraudulent transfer is derivative because it is based upon: (1) the creditor's claim against the debtor for an unpaid debt; and (2) the debtor's fraudulent transfer claim against the recipient. In the alter ego or veil piercing context, a creditor's claim against a corporation's parent is derivative because it is based upon: (1) the creditor's claim against the corporation for an unpaid debt; and (2) the corporation's alter ego/veil piercing claim against its parent. In the insurance context, a creditor's claim against the debtor's insurer (a direct action) is derivative because it is based upon: (1) the plaintiff's claim against the debtor for an unpaid debt; and (2) the debtor's claim against its insurer under the debtor's insurance policy.[4]

Here, the plaintiffs have filed two tort claims against CNA under Montana law- a negligence claim and a breach of duty to warn claim. Under the elements of each of these claims, CNA owes a duty to the plaintiffs which is entirely independent of CNA's contractual duties to Grace under the CNA Policies. In addition, the tort claims are not based upon claims that Grace has against CNA, nor could Grace have filed these types of claims against CNA under Montana law. Indeed, the tort claims are based upon allegations that CNA engaged in misconduct, and are

---

[4] In this case, the Third Circuit held that derivative claims against insurers are not limited to instances where a plaintiff seeks to recover against the debtor's insurance policy, because "nothing in the statute's text supports indirect insurer liability only where a claimant seeks to recover from insurance proceeds." *Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.),* 900 F.3d 126, 136 (3d Cir. 2018). While it is true that § 524(g)(4)(A)(ii) does not explicitly limit derivative claims against an insurer to claims which seek to recover against the proceeds of a debtor's insurance policy, this section was not drafted to apply *only* to a debtor's insurer. Rather, it was drafted in a broad manner to encompass all of the potential types of derivative claims that could be filed against *any entity* who had one of the enumerated relationships listed in § 524(g)(4)(A)(ii)(I)-(IV) with the debtor and does not specifically identify the types of derivative claims that can be brought against any of these entities. This court, therefore, respectfully observes that the text's failure to explicitly limit indirect insurer liability to instances where a claimant seeks to recover insurance proceeds does not mean that there are other types of derivative claims that can be filed against insurers. Indeed, the only derivative claims filed against an insurer that have been enjoined by the Second Circuit under § 524(g)(4)(A)(ii) have been claims seeking recovery against the proceeds of the debtor's insurance policy. *See MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89, 90-94 (2d Cir. 1988); *Manville III,* 517 F.3d at 55, 62-63, 65-66, 68; *Manville IV,* 600 F.3d at 141-42, 145-46, 149, 151-53.

not based upon Grace's conduct. Moreover, the tort claims will not affect the *res* of Grace's bankruptcy estate because, if successful, the plaintiffs will obtain a judgment against CNA which can only be executed against CNA's assets, not Grace's assets. Accordingly, CNA has failed to demonstrate that the tort claims satisfy the derivative liability requirement set forth in § 524(g)(4)(A)(ii).

Before addressing the statutory relationship requirement, the court is compelled to respectfully observe that it does not appear that the bankruptcy court had jurisdiction to enjoin the Montana tort claims. The bankruptcy court exercised jurisdiction over the tort claims on the basis of a reimbursement provision in a settlement agreement previously approved by the bankruptcy court which requires CNA to be reimbursed for part of any payment that it makes on account of the tort claims, if such claims are not enjoined under § 524(g) and the plaintiffs prevail on such claims in state court. However, outside of this reimbursement obligation, neither Grace nor the bankruptcy trust has *any* liability to CNA on account of the tort claims. Since subject matter jurisdiction cannot be conferred by consent of the parties and there is no basis for jurisdiction other than the reimbursement provision in the settlement agreement, the bankruptcy court lacked jurisdiction to enjoin the tort claims.

In analyzing the statutory relationship requirement of § 524(g)(4)(A)(ii)(III), the Third Circuit instructed the court to determine whether CNA's provision of insurance to Grace is legally relevant to the elements of the tort claims. Upon review of the elements of the tort claims, CNA's provision of insurance to Grace has no legal relevance to the tort claims under Montana law. Rather, under the elements of the negligence claim, it is only required that CNA provide *a service* to Grace in order for the duty to arise. Under the elements of the duty to warn claim, it is only required that CNA engage with a hazard or be in a position with respect to foreseeable

victims and a hazard in order for the duty to arise. There is no requirement under either of these

tort claims, therefore, that the third party provide insurance to the plaintiff in order for the third

party's duty to arise under Montana law. Accordingly, CNA has failed to demonstrate the

requisite statutory relationship required under § 524(g)(4)(A)(ii)(III).

Based upon the foregoing, the court concludes that the Montana Claims may proceed in

Montana state court.

## II.    BACKGROUND

As the facts surrounding Grace's bankruptcy and the instant adversary proceeding have

been discussed on numerous occasions, the court will only briefly recount those facts pertinent to

the disposition of the issues currently on remand.

From 1963 to 1990, Grace owned and operated a vermiculite mine in the vicinity of

Libby, Montana ("Libby Facility"). *In re W.R. Grace & Co.,* 475 B.R. 34, 64 (D. Del. 2012). The

mining and milling activity performed at the Libby Facility generated and released substantial

airborne dust containing asbestos into the surrounding atmosphere. *Id.* As a result, many Grace

workers, their families, and Libby residents were exposed to hazardous levels of asbestos

originating from the Libby Facility. *Id.* at 64-65. In the 1970s, individuals allegedly injured by

exposure to asbestos in Libby began filing lawsuits against Grace. *Id.* at 65.

Between 1973 and 1985, CNA issued workers' compensation, employer liability, and

other insurance policies to Grace in connection with its operation of the Libby Facility. *Cont'l*

*Cas. Co. v. Carr (In re W.R. Grace & Co.),* 900 F.3d 126, 131 (3d Cir. 2018); *In re W.R. Grace*

*& Co.,* No. 01-01139, Adv. No. 15-50766 (KJC), 2016 WL 6068092, at *1 (Bankr. D. Del. Oct.

17, 2016). Some of these insurance policies permitted, but did not obligate, CNA to inspect the

Libby Facility. *Carr,* 900 F.3d at 131-32; *W.R. Grace,* 2016 WL 6068092, at *1.

By 2001, over 65,000 asbestos-related personal injury lawsuits involving over 129,000 claims had been filed against Grace. *W.R. Grace,* 475 B.R. at 65. On April 2, 2001, due to the massive volume of litigation pending against Grace, Grace filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware ("Bankruptcy Court"). *Id.* at 64; *W.R. Grace,* 2016 WL 6068092, at *2.

On November 18, 2010, after years of pre- and post-petition litigation between Grace and CNA regarding the scope of CNA's coverage of Grace's asbestos liabilities under the CNA Policies, CNA and Grace entered into a settlement agreement ("Settlement Agreement"). *W.R. Grace,* 475 B.R. at 69; *W.R. Grace,* 2016 WL 6068092, at *3. Under the Settlement Agreement, CNA would contribute $84 million, over a period of six years, to an Asbestos Personal Injury Trust ("Trust") which Grace's reorganization plan would establish to compensate holders of asbestos-related personal injury claims ("Asbestos PI Claims"). *Carr,* 900 F.3d at 132. Furthermore, per the terms of the Settlement Agreement, the Trust would be obligated to reimburse CNA up to $13 million ("Reimbursement Provision") for any payments CNA makes on account of Asbestos PI Claims that are not successfully channeled through the Trust. *Id.*

On January 31, 2011, the Bankruptcy Court confirmed Grace's plan of reorganization ("Plan"). *W.R. Grace,* 475 B.R. at 71. That decision was appealed and, on January 30, 2012, the District Court for the District of Delaware ("District Court") affirmed the Plan's confirmation and issued an amended opinion supporting that decision on June 11, 2012. *Id.* at 63 n. 1, 64. On September 4, 2013, the Third Circuit affirmed the District Court's order. *In re W.R. Grace & Co.,* 729 F.3d 311, 314 (3d Cir. 2013). The Plan took effect on February 3, 2014 ("Effective Date"). *W.R. Grace,* 2016 WL 6068092, at *2.

The Plan, in relevant part, establishes a channeling injunction ("Channeling Injunction") pursuant to § 524(g) of the Bankruptcy Code which enjoins holders of Asbestos PI Claims from attempting to recover against Grace and certain protected parties outside of the bankruptcy process.[5] *Id.* at *2-3. Instead, all such claims are channeled into the Trust for recovery. *Id.*

After the Plan took effect in 2014, several identical complaints ("Complaints") were filed in Montana state court directly against CNA on behalf of various Grace workers, their families, and residents of Libby (together, the "Montana Plaintiffs") alleging that they had contracted asbestos-related diseases due to asbestos exposure stemming from the Libby Facility. *Id.* at *3-4; Montana Compl. ¶ 26; Appellees' Br. on Remand 7. According to the Complaints, CNA had voluntarily provided industrial hygiene services at the Libby Facility and become aware of the hazardous conditions there through its inspections of the facility. Montana Compl. ¶¶ 156-159, 162. The Complaints allege that CNA's negligence in performing the industrial hygiene services and its failure to warn the Montana Plaintiffs about the dangers of asbestos exposure contributed to and/or caused the Montana Plaintiffs' asbestos-related injuries ("Montana Claims"). *Id.* at ¶¶ 160-165. On June 8, 2015, CNA filed the instant adversary proceeding ("CNA Adversary Proceeding") seeking a declaratory judgment that the Montana Claims are enjoined by the Channeling Injunction. *W.R. Grace*, 2016 WL 6068092, at *4.

The Montana Plaintiffs filed a motion to dismiss the CNA Adversary Proceeding. *W.R. Grace*, 2016 WL 6068092, at *1. In response, CNA filed a motion for summary judgment which also was captioned as an opposition to the Montana Plaintiffs' motion to dismiss. *Id.* The Montana Plaintiffs filed an objection to CNA's motion for summary judgment and agreed to

---

[5] The protected parties include "Settled Asbestos Insurance Companies," such as CNA, which entered into "Asbestos Insurance Settlement Agreements" with Grace and are identified in Exhibit 5 of the Plan. *W.R. Grace*, 2016 WL 6068092, at *3.

have the motion to dismiss treated as a cross-motion for summary judgment. *See id.* at *1 n. 4.

On October 17, 2016, the Bankruptcy Court granted CNA's motion for summary judgment in a

memorandum opinion and denied the Montana Plaintiffs' cross-motion for summary judgment.

*Id.* at *1.

In its decision, the Bankruptcy Court held, in relevant part, that the Montana Claims were

enjoined by the Channeling Injunction because the claims met both the derivative liability

requirement and the statutory relationship requirement under § 524(g)(4)(A)(ii). *See id.* at *7-13.

In concluding that the Montana Claims were enjoined, the Bankruptcy Court made two

significant determinations. First, the Bankruptcy Court determined that the Montana Claims were

derivative claims in that they sought to hold CNA indirectly liable for harm caused by Grace's

conduct, because they were based upon exposure to asbestos from Grace's products or

operations. *Id.* at *7. Second, the Bankruptcy Court determined that CNA's alleged liability for

the Montana Claims arose by reason of CNA's provision of insurance to Grace, since CNA's

inspections of the Libby Facility and provision of industrial hygiene services arose out of the

parties' insurance relationship. *Id.* at *12-13.

The Montana Plaintiffs appealed the Bankruptcy Court decision directly to the Third

Circuit. Appellees' Br. on Remand 2; Appellants' Br. on Remand 12-13. On August 14, 2018,

after having accepted the Montana Plaintiffs' direct appeal, the Third Circuit issued its opinion

and affirmed in part, vacated in part, and remanded the case back to the Bankruptcy Court for

further proceedings consistent with guidelines provided in the opinion. *Carr,* 900 F.3d at 130.

The Third Circuit affirmed the Bankruptcy Court's holding that the CNA Policies are among

those covered by the Channeling Injunction's terms and confirmed that the Bankruptcy Court

10

had jurisdiction to enjoin the Montana Claims under the Channeling Injunction. *Id.* at 134-35, 138-39

The Third Circuit vacated the Bankruptcy Court's holding that the Montana Claims satisfied the derivative liability and statutory relationship requirements under § 524(g)(4)(A)(ii) and remanded these issues back to the Bankruptcy Court with instructions. *Id.* at 135-38. With regard to the derivative liability requirement, the Third Circuit rejected CNA's assertion that § 524(g)(4)(A)(ii) applies to any claim against a third party that is based upon injuries from, or exposure to, the debtor's asbestos products. *Id.* at 137. The Third Circuit noted that this assertion was overly broad, because it "has the potential to include third-party liability that is wholly separate from a debtor's liability." *Id.* The Third Circuit held that the "involvement of the debtor's asbestos is relevant, but not dispositive" and that "there may be cases in which the involvement of the debtor's product is only incidental." *Id.* In such instances, "the presence of the debtor's asbestos would not render the third-party's liability derivative." *Id.*

The Third Circuit also rejected the Montana Plaintiffs' assertion that § 524(g)(4)(A)(ii) only applies to direct actions against insurers for insurance proceeds. *Id.* at 136. The court stated that this assertion was overly narrow, because nothing in the statute's text supports indirect insurer liability "only where a claimant seeks to recover from insurance proceeds." *Id.* It also found that allegations that a third party allegedly engaged in some wrongdoing are insufficient to render such claim nonderivative. *Id.*

Consistent with the framework adopted by the Second Circuit in *Quigley* in analyzing derivative liability, the Third Circuit concluded that the "proper inquiry is to review the law applicable to the claims being raised against the third party (and when necessary to interpret state law) to determine whether the third-party's liability is wholly separate from the debtor's liability

11

or instead depends on it." *Id.* at 137. This inquiry does not require the court to decide the merits of such state law claims; rather, it requires that the court determine "what liability under the relevant law demands." *Id.* In short, consistent with the approach taken by the Second Circuit, the court must look "to the relevant state law to determine whether the plaintiffs' rights derived from the debtor's rights and the alleged duty the third party owed to the plaintiffs derived from the duty it owed to the debtor." *Id.* at 137 n. 7 (citations omitted).

With regard to the statutory relationship requirement, the Third Circuit noted that the Bankruptcy Court had not adopted either party's construction thereof. *Id.* at 138. CNA had asserted that liability arises "by reason of" one of the four enumerated statutory relationships when that relationship is a "but for" factual cause of the third party's alleged liability. *Id.* at 138 n. 8. The Montana Plaintiffs had asserted that liability arises "by reason of" one of the four enumerated relationships when that relationship is a legal cause of, or a legally relevant factor to, the third party's alleged liability. *Id.* at 138; *see also W.R. Grace*, 2016 WL 6068092, at *8, 11. Instead, the Bankruptcy Court held that, even if the Montana Plaintiffs' more stringent "legal consequence" standard applied, the insurance relationship between Grace and CNA was legally relevant to the Montana Claims, because "[t]he basis for the alleged undertakings by CNA (*i.e.*, industrial hygiene services or inspections of Grace's facilities) arise wholly out of the insurance relationship." *Carr,* 900 F.3d at 138 (quoting *W.R. Grace*, 2016 WL 6068092, at *13).

On appeal, the Third Circuit did "not disturb the Bankruptcy Court's assumption that CNA's provision of insurance to Grace must be a 'legally relevant factor' to its alleged liability." *Id.* However, the Third Circuit instructed the Bankruptcy Court on remand to "review the applicable law to determine the relationship's legal relevance to the third-party's alleged liability." *Id.* Specifically, the Third Circuit directed the court to "examine the elements

necessary to the Montana Claims under the applicable law (here, state law), and determine whether CNA's provision of insurance to Grace is relevant legally to those elements." *Id.*

Based upon the foregoing, this court construes the analysis prescribed by the Third Circuit as follows: (1) with respect to the derivative liability requirement, the court must determine whether CNA's alleged liability to the Montana Plaintiffs is "wholly separate" from CNA's contractual obligations to Grace under the CNA Policies;[6] and (2) with respect to the statutory relationship requirement, the court must determine whether CNA's provision of insurance to Grace is a "legally relevant factor" under the elements necessary to establish the Montana Claims against CNA under applicable state law.

The parties subsequently made submissions to this court on remand and, on July 17, 2019, the court heard extensive argument.[7] The parties filed supplemental briefing and the matter is now ripe for decision.

## III.    DISCUSSION

### A. Derivative Liability

With respect to the derivative liability requirement, the court begins its analysis with a review of *Tronox Inc. v. Kerr-McGee Corp. (In re Tronox)*, 855 F.3d 84 (2d Cir. 2017), which was cited by the Third Circuit in its opinion and generally addresses derivative liability in the

---

[6] In other words, consistent with footnote 7 of the Third Circuit's opinion, this court must determine whether the Montana Plaintiffs' rights against CNA are based upon Grace's rights against CNA and, similarly, whether CNA's alleged duty to the Montana Plaintiffs is based upon CNA's duty to Grace or is based on an entirely separate duty arising under Montana law.

[7] This adversary proceeding, the main bankruptcy case and a related adversary proceeding were transferred from the Honorable Kevin J. Carey to the Honorable Ashely M. Chan in May of 2019. *See* Designation of a Bankruptcy Judge for Service in Another District Within the Circuit, dated May 10, 2019, which was signed by the Chief Judge of the United States Court of Appeals for the Third Circuit, the Honorable D. Brooks Smith, designating and assigning the Honorable Ashely M. Chan to temporarily serve as a bankruptcy judge in the District of Delaware for such a period as is necessary for the disposition of the following cases: Bankr. Case No. 01-1139, Adv. Proc. No. 15-50766, and Adv. Proc. No. 18-50402 (collectively, the "Cases"); Order of Reassignment of Judge, dated May 14, 2019, which was signed by Chief Judge of the Bankruptcy Court of the District of Delaware, the Honorable Christopher Sontchi, entering an order transferring the Cases to this court.

context of bankruptcy cases. The court then turns to the derivative liability analysis set forth in

*Quigley*, which the Third Circuit also relied upon in its opinion, and the seminal *Johns-Manville*

cases discussed therein.

### 1. Derivative Liability in *Tronox*

As discussed *supra*, the Third Circuit noted that merely alleging that a third party

engaged in wrongdoing does not render such claim nonderivative. *Carr*, 900 F.3d at 136. In

support of this, the court cited, *inter alia*, the *Tronox* case, which analyzed whether fraudulent

transfer and personal injury claims brought by toxic tort victims against a third party were

derivative claims. *Tronox Inc.*, 855 F.3d at 105-06. In that case, thousands of individuals were

injured by a debtor's prepetition operation of a wood-treatment plant. *Id.* at 88. Prior to filing for

bankruptcy, the debtor transferred its lucrative oil and gas business to a newly created entity

("NewCo") while leaving massive environmental and tort liabilities with the debtor. *Id.*

After the debtor and NewCo were sued by the toxic tort victims, the debtor filed for

bankruptcy protection. *Id.* Once in bankruptcy, the debtor filed an adversary proceeding against

NewCo to avoid the debtor's prepetition transfer of assets to NewCo as a fraudulent transfer. *Id.*

NewCo ultimately settled the litigation for over $5 billion, with more than $600 million carved

out for toxic tort victims. *Id.* As part of the settlement agreement, NewCo obtained an injunction

which barred the litigation of claims that were derivative or duplicative of the debtor's claims

against NewCo. *Id.*

After the settlement agreement was approved, the toxic tort victims sought to revive their

claims against NewCo based upon alter ego, veil piercing, and successor liability theories in

order to hold NewCo responsible for the debtor's conduct. *Id.* In response, NewCo filed a motion

seeking to enforce the injunction in the settlement agreement asserting that the victims' claims

were barred by the injunction because they arose from liabilities that derived from, or through,

14

the debtor that were generalized and common to all of the debtor's creditors. *Id.* The district court agreed with NewCo and held that the plaintiffs' claims were attempts to impute the debtor's conduct to NewCo and were general claims which could have been brought by any of the debtor's creditors. *Id.* at 94. Accordingly, the court concluded that the plaintiffs' claims were derivative and therefore property of the debtor's estate. *Id.*

On appeal, the Second Circuit recognized that, although bankruptcy courts generally do not have jurisdiction to release nondebtor third-party claims, they do have jurisdiction over derivative claims because they are "claims 'based on rights 'derivative' of, or 'derived' from, the debtor's'" rights and, therefore, "constitute 'property of the estate.'" *Id.* at 99 (citations omitted). The court confirmed that:

> 'Derivative claims' in the bankruptcy context are those that 'arise[] from harm done to the estate' and that 'seek [] relief against third parties that pushed the debtor into bankruptcy.' *Id.* at 100 (citations omitted).

The Second Circuit recognized that labels used by plaintiffs to describe their claims are not conclusive because parties often attempt to plead around a bankruptcy. *Id.* Accordingly, the court understood that it should not merely inquire about the factual origins of injuries but, "more importantly, into the nature of the legal claims asserted." *Id.* (citations omitted). In contrast to nonderivative claims which "are personal to the individual creditor and of no interest to the others," the court found that, if a claim could be brought by *any* of the debtor's creditors, "the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *Id.* (citations omitted).

The Second Circuit ultimately focused on the Third Circuit's majority decision in *Emoral, Inc. v. Diacetyl (In re Emoral, Inc.)*, 740 F.3d 875 (3d Cir. 2014), where plaintiffs had argued that their successor liability claims against an entity which had been the recipient of a

15

fraudulent transfer by the debtor, were nonderivative claims. *Id.* at 102-04. In that case, the Third

Circuit held that such claims were derivative because the plaintiffs "fail[ed] to demonstrate how

any of the factual allegations that would establish their cause of action based on successor

liability are unique to them as compared to other creditors of Emoral," or "how recovery on their

successor liability cause of action would not benefit all creditors of Emoral given that [Emoral's

successor], as a mere continuation of Emoral, would succeed to all of Emoral's liabilities."

*Emoral*, 740 F.3d at 880.

The Second Circuit agreed with the Third Circuit majority's determination that courts

should not focus on the nature of the injuries:

> [O]ften there are claims against third parties that wrongfully
> deplete the debtor's assets. Individual creditors may wish to bring
> claims against those third parties to seek compensation for harms
> done to them by the debtor *and secondary harms done to them by
> the third parties in wrongfully diverting assets of the debtor that
> would be used to pay the claims of the individual creditor.* The fact
> that an individual creditor may seek to do so does not make those
> secondary claims particular to the creditor, for it overlooks the
> obvious: *Every creditor has a similar claim for the diversion of
> assets of the debtor's estate.* Those claims are general—they are
> not tied to the harm done to the creditor by the debtor, but rather
> are based on an injury to the debtor's estate that creates a
> secondary harm to all creditors regardless of the nature of their
> underlying claim against the debtor. *Tronox Inc.,* 855 F.3d at 103-
> 04 (emphasis added).

The Second Circuit concluded that the:

> plaintiffs in *Emoral* would have courts allow an individual creditor
> to sue third-party successors of debtors for claims that are truly
> aimed at recovering estate assets [because the] exact same claim
> advanced by the trustee on behalf of the estate would be a win for
> all creditors of the estate, but a win by a single creditor would be a
> win by one to the detriment of the others. *Id.* at 104.

Such outcome "'is precisely the sort of result the Bankruptcy Code exists to forestall, by placing exclusive standing over estate claims in the bankruptcy trustee or plan administrator.'" *Id.* (citations omitted).

Applying those principles to the facts in *Tronox*, the Second Circuit noted that the plaintiffs did not allege any "direct-liability claims" against NewCo. *Id.* If the plaintiffs had raised direct claims against NewCo- that NewCo had either instructed its subsidiaries not to clean up the toxic site or was negligent in its supervision of the cleanup- the harm would have been suffered directly and solely by the plaintiffs as a result of the acts of NewCo. *Id.* at 104-05. As a result, such claims would have constituted nonderivative claims, because they would have constituted independent and particularized claims, belonging only to the plaintiffs as individual creditors. *Id.*

Instead, the plaintiffs only raised indirect claims against NewCo through alter ego/veil piercing theories that sought to impute the acts of the debtor to NewCo. *Id.* at 105. Specifically, the plaintiffs raised two types of claims against NewCo: (1) fraudulent transfer claims alleging that NewCo mismanaged and undercapitalized the debtor, thereby leaving the debtor with insufficient assets to pay its creditors upon filing bankruptcy; and (2) personal injury claims alleging that NewCo was liable for the tortious acts of the debtor. *Id.*

The court easily dismissed the fraudulent transfer claims as derivative claims which were based upon the debtor's right to sue, because they are the "paradigmatic example of claims general to all creditors," which only the debtor/trustee may bring for the benefit of all of the debtor's creditors. *Id.* at 106. Any recovery from the avoidance of such transfers would be returned to the debtor's bankruptcy estate to benefit all the creditors. *Id.*

17

With regard to the personal injury claims, the court found that the alleged liability of NewCo "arises not from its own conduct, but from its alleged existence as the alter ego and successor to the liabilities of the former parent of the actual tortfeasor..." *Id.* As a result, the harm that the plaintiffs allegedly suffered at the hands of NewCo was the same harm suffered by *all* the debtor's creditors. *Id.* The court held that allowing plaintiffs to proceed with their claims against NewCo would essentially subvert the "whole point of channeling claims through bankruptcy [which] is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets." *Id.* (citations omitted). The court therefore concluded that plaintiffs lacked standing to pursue the personal injury claims because such claims constituted estate property and explained that:

> the trustee is conferred the right to recover for derivative,
> generalized claims; only the estate is charged with ensuring
> equitable distribution of estate assets and preventing individual
> creditors from pursuing their own interests and thus diminishing
> the *res* available to the rest of the creditors. *Id.*

In the Third Circuit's opinion in this case, the court cited *Tronox* for the proposition that mere allegations that a third party has engaged in misconduct does not necessarily make such claim nonderivative. *Carr,* 900 F.3d at 136. Instead, courts must go beyond a factual inquiry of the injuries sustained by the plaintiff and determine the nature of the legal claim asserted against the third party in order to determine whether a claim alleging wrongdoing against a third party is derivative. *See id.* at 137.

*Tronox* thus aptly sets forth the legal differences between a derivative claim and a nonderivative claim. Generally, a derivative claim is a claim based upon a right that is derivative of, or derived from, a right held by the debtor. A derivative claim, thus, is a general claim which can be brought by the debtor (or a trustee on behalf of all the debtor's creditors). Accordingly, any recovery on account of a derivative claim goes directly to the debtor's estate to benefit all

18

creditors. A derivative claim, therefore, constitutes property of the debtor's estate and the debtor (or trustee) is the only party who has standing to pursue such a claim.

In contrast, a nonderivative claim cannot be brought by the debtor or trustee, because it is not based upon a right held by the debtor. Any recovery on account of a nonderivative claim goes directly to the claimant and has no impact on the debtor's bankruptcy estate. As a result, a nonderivative claim does not constitute property of the estate and, therefore, bankruptcy courts typically do not have jurisdiction over such claims.

Finally, the Second Circuit recognized in *Tronox* that the toxic tort victims would have held a nonderivative claim against NewCo if they had alleged that NewCo had been negligent in its supervision of the cleanup, because such claim could not have been brought by the debtor and would have been based upon NewCo's misconduct, not the debtor's misconduct. In that instance, the plaintiffs would have held: (1) direct claims against the debtor based upon the debtor's toxic business operations; (2) derivative claims against NewCo for the fraudulent transfer and personal injury claims based upon their alter ego/piercing the corporate veil and successor liability theories; and (3) nonderivative claims against NewCo for NewCo's negligence in supervising the cleanup. Notably, the plaintiffs would have held nonderivative claims against NewCo, regardless of the fact that the plaintiffs would not have suffered any injuries beyond the toxic tort injuries initially caused by the debtor.

## 2. Derivative Liability Analysis in *Quigley*

The court now turns to the Second Circuit's decision in *Quigley* which addressed derivative liability in the context of the *Johns-Manville* asbestos cases. The court will first review the historical background of the *Johns-Manville* bankruptcy case and the injunction created by the bankruptcy court which ultimately formed the basis of the channeling injunction established under § 524(g). The court will then thoroughly analyze each of the three *Johns-*

19

*Manville* decisions discussed in *Quigley* in order to examine the evolution of the derivative

liability analysis in the Second Circuit. Finally, the court will return to *Quigley* to review the

factual background in that case and the Second Circuit's holding on the role that the derivative

liability analysis plays in the determination of a court's jurisdiction.

### 3. Derivative Liability in the *Johns-Manville* Bankruptcy Cases

### a. *Johns-Manville* Historical Background

By way of background, Manville was "the largest supplier of raw asbestos and

manufacturer of asbestos-containing products in the United States" from the 1920s to the 1970s.

*Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 140 (2009). For most of that time, Travelers

Indemnity Co. ("Travelers") was Manville's primary liability insurer. *Id.* After studies began to

link asbestos exposure to respiratory disease, thousands of lawsuits were filed against Manville

in the 1960s and 1970s. *Id.* During that time, Travelers worked closely with Manville to

determine what Manville knew and to assess the dangers of asbestos exposure. *Id.* Ultimately,

Manville buckled under the weight of its asbestos liability and, in 1982, Manville filed for

Chapter 11 protection. *Johns–Manville Corp. v. Chubb Indem. Ins. Co. ("Manville IV")*, 600

F.3d 135, 138 (2d Cir. 2010).

Although Manville's insurance policies were the debtor's most valuable asset, there was

uncertainty about the value of the policies because Manville "was engaged in extensive litigation

with its insurance carriers regarding the scope and limits of its policies." *Johns–Manville Corp.

v. Chubb Indem. Ins. Co. ("Manville III")*, 517 F.3d 52, 56 (2d Cir. 2008), *rev'd on other grounds

sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009).

In order to resolve the uncertainty of such litigation and to fund its plan of reorganization,

Manville engaged in settlement negotiations with its insurance carriers regarding its coverage for

asbestos-related liabilities. *Id.*

Ultimately, Manville entered into a settlement agreement with its insurers in 1984 ("Settlement Agreement") and sought the bankruptcy court's preliminary approval. *Manville IV,* 600 F.3d at 139. The Settlement Agreement provided that, in exchange for payments by its insurers totaling $770 million, the insurers would be relieved of all liability under the insurance policies. *Bailey,* 557 U.S. at 141. The settlement was conditioned upon the entry of an order by the bankruptcy court enjoining all suits against the insurers related to the settled insurance policies and directing litigation by potential claimants to the Manville Personal Injury Settlement Trust ("Manville Trust"), which was created under the Settlement Agreement. *Manville III,* 517 F.3d at 56-57.

In support of its motion to approve the Settlement Agreement, Manville stated that:

> The parties to the Agreement will request this Court to order that[,] because these [insurance] policies constitute property of the [Manville] estate under Section 541 of the [Bankruptcy] Code ..., the property be liquidated by this settlement, and that all claims by any person to the *res* be channeled to that liquidated fund, and that all persons be enjoined from suing the Settling Insurers because the property of the estate has been liquidated and will be in possession of the Court. *Manville IV,* 600 F.3d at 139.

Manville also clarified that:

> it did 'not seek to have [the Bankruptcy] Court release its Settling Insurers from claims by third parties *based on the Insurer's own tortious misconduct towards the third party*' but rather sought only to release the insurers 'from the rights Manville might itself have against them or rights derivative of Manville's rights under the policies being compromised and settled.' *Bailey,* 557 U.S. at 161 (emphasis added).

Travelers offered to contribute almost $80 million to the Manville Trust, agreed with the limitations on the bankruptcy court's jurisdiction, and noted that: "[t]he Court has *in rem* jurisdiction over the Policies and thus the power to enter appropriate orders to protect that jurisdiction." *Id.; Manville IV,* 600 F.3d at 139, 141. *See also Manville III,* 517 F.3d at 57. It also

21

stated that "the injunction is intended only to restrain claims against the *res* (*i.e.*, the Policies) which are or may be asserted, against the Settling Insurers." *Bailey*, 557 U.S. at 161-162. *See also* App. for Respondent Chubb Indemnity Insurance Co. 10a (memorandum of the legal representative of the Bankruptcy Court noting that "[a]ll parties seem to agree that any injunction, channeling order and release is limited to this Court's jurisdiction over the *res*").

Various parties objected to the Settlement Agreement, including the Committee of Asbestos–Related Litigants and/or Creditors ("Committee"), which challenged the definition of "Policy Claims" in the Settlement Agreement:

> The [Settling] Insurers' breach of covenants of good faith and fair dealing and consumer protection statutes (*e.g.*, Calif. Insur. Code § 790.09(h)) clearly arise out of or relate to the Policies [at issue in the Settlement]... *But these claims are not direct actions for proceeds; they are independent third party claims against the [Settling] Insurers which are not derivative of Manville's rights.* The [Manville] Estate never has, or can ever have, any right in these claim proceeds, for they are not contractual—they are personal rights which the victims have for the tortious conduct of the [Settling] Insurers... It is well-established that the [Bankruptcy] Court has no jurisdiction ... to grant the discharge of and injunction against these independent, non-derivative claims, as the [1984 Insurance Settlement] Agreement requires. *Manville IV*, 600 F.3d 140-41 (emphasis added).

In response to these and other objections to the Settlement Agreement, all the parties entered into a letter agreement on June 3, 1985, which operated as an amendment to the Settlement Agreement. *Id.* at 141. The letter agreement provided, in part:

> The Court has *in rem* jurisdiction over the Policies and thus the power to enter appropriate orders to protect that jurisdiction. The channeling order is intended *only* to channel claims against the *res* [of the Manville estate] to the Settlement Fund and the injunction is intended *only* to restrain claims against the *res* (*i.e.*, the Policies) which are or may be asserted against the Settling Insurers. *Id.*

Travelers' counsel also signed the letter agreement and indicated that "[t]he foregoing is confirmed on behalf of the Travelers Indemnity Company ... and each of its Affiliates." *Id.* On

September 26, 1985, the bankruptcy court entered a preliminary order that "approved pursuant to

Rule 9019 of the Rules of Bankruptcy Procedure" the Insurance Settlement Agreement "together

with" the June 3, 1985 letter agreement. *Id.*

Other objections were raised to the Settlement Agreement which ultimately led to the

issuance of the Second Circuit's decision in *MacArthur Co. v. Johns-Manville Corp.*

(*"MacArthur"*), 837 F.2d 89 (2d Cir. 1988).

### b. *MacArthur*

MacArthur Company ("MacArthur") was a distributor of Manville's asbestos products

and coinsured with Manville under Manville's insurance policies pursuant to vendor

endorsements. *MacArthur,* 837 F.2d at 90. The vendor endorsements provided coverage for

liability related to MacArthur's sale of Manville's asbestos products. *Id.* MacArthur believed that

it was entitled to coverage under the policies for multiple lawsuits filed against it arising from the

sale of Manville's asbestos products to its customers. *Id.* at 91. MacArthur therefore objected to

the approval of the Settlement Agreement because it argued that the proposed injunctions would

impair MacArthur's rights to sue the insurers under the vendor endorsements. *Id.*

The bankruptcy court dismissed MacArthur's objections from the bench based upon its

finding that MacArthur's interest in the policies was "highly speculative." *Id.* On December 18,

1986, the bankruptcy court granted final approval of the Settlement Agreement ("Settlement

Order"), and entered an order confirming the Manville Plan on December 22, 1986

("Confirmation Order," and collectively, with the Settlement Order, the "1986 Orders").

*Manville IV*, 600 F.3d at 141. The 1986 Orders "channeled to the Manville Trust any and all

claims that were based upon, arose out of, or related to Manville's liability insurance policies."

*Manville III,* 517 F.3d at 57. The bankruptcy court noted throughout this litigation that its:

repeated use of the terms 'arising out of' and 'related to' were not gratuitous or superfluous; they were meant to provide the broadest protection possible to facilitate global finality for Travelers as a necessary condition for it to make a significant contribution to the Manville estate. *Id.*

The district court affirmed the 1986 Orders on July 15, 1987, and MacArthur appealed the orders. *MacArthur*, 837 F.2d at 91. On appeal, MacArthur argued that the bankruptcy court did not have jurisdiction to enjoin its independent contractual claims against the insurers because MacArthur's vendor endorsement rights were separate from Manville's, thereby rendering its claims under the vendor endorsements too remote to give the bankruptcy court jurisdiction. *Id.* at 91-92.

The Second Circuit ultimately held that the underlying insurance policies constituted property of the estate and that the vendor endorsements covered "only those liabilities resulting from the vendor's status as a distributor of Manville's products." *Id.* at 92. The court further held that "the endorsements [were] limited by the product liability limits of the underlying Manville policies and [were] otherwise subject to all of the terms of the underlying policies," and therefore that "MacArthur's rights as an insured vendor [were] completely derivative of Manville's rights as the primary insured." *Id.*

Since MacArthur sought to "collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct," the Second Circuit concluded that "[s]uch derivative rights are no different…from those of the asbestos victims who have already been barred from asserting direct actions against the insurers." *Id.* at 92-93 (citing *In re Davis*, 730 F.2d 176 (5th Cir. 1984)) (per curiam). Accordingly, the Second Circuit determined that the bankruptcy court had jurisdiction to enjoin MacArthur's derivative claims against the insurers pursuant to the Settlement Agreement. *Id.*

### c. *Manville III*[8]

Following the entry of the 1986 Orders and *MacArthur*, twenty-six independent actions

("Direct Actions") were filed by plaintiffs alleging various statutory and common law claims

against Manville's insurers in state courts in Louisiana, Massachusetts, Texas, and West

Virginia. *Manville III*, 517 F.3d at 57-58. The statutory and common law claims shared the same

factual predicate:

> Travelers acquired knowledge regarding the dangers of asbestos in
> the 1950s, recognized the potential for future escalation of asbestos
> litigation, and influenced Manville's purported failure to disclose
> its knowledge of asbestos hazards... *Travelers negligently
> performed inspections*, conspired to deprive plaintiffs of
> information relating to the risks of asbestos exposure, and
> misrepresented and suppressed information regarding asbestos. *Id.*
> at 58 (emphasis added).

Travelers subsequently filed a motion in Manville's bankruptcy case to enjoin the Direct

Actions. *Id.* The bankruptcy court referred the matter to mediation and appointed the Honorable

Mario M. Cuomo, former Governor of the State of New York, as mediator. *Id.* Three sets of

plaintiffs ultimately settled and sought bankruptcy court approval of a settlement agreement with

Travelers which provided that Travelers would pay almost $500 million in exchange for the

entry of a bankruptcy court order "clarifying that the Direct Action lawsuits are, and have always

been, prohibited by the 1986 orders." *Id.*

Based upon extensive fact-finding regarding Manville's relationship with Travelers, the

bankruptcy court found that:

> Travelers learned virtually everything it knew about asbestos from
> its relationship with Manville... [Because] the gravamen of [the]
> Direct Action Claims were acts or omissions by Travelers arising

---

[8] As discussed *infra*, although the Supreme Court reversed the Second Circuit's decision in *Manville III* because it determined that res judicata barred the plaintiffs' challenge to the bankruptcy court's jurisdiction to enter the 1986 Orders, the Second Circuit in *Manville IV* "clarified that the Supreme Court 'did not contradict the conclusion of [*Manville III's*] jurisdictional inquiry'" and specifically reaffirmed the jurisdictional analysis therein. *Quigley*, 676 F.3d at 56 n.12.

> from or relating to Travelers' insurance relationship with Manville,
> ... claims against Travelers based on such actions or omissions
> necessarily 'arise out of' and 'related to' the Policies. *Id.* at 59
> (citations omitted) (internal quotation marks omitted).

The bankruptcy court also noted that "while the Direct Action plaintiffs argued that their

injuries were separate and independent from those incurred from asbestos exposure, each had

experienced personal injury from some form of asbestos exposure." *Id.* Ultimately, the

bankruptcy court approved the settlement agreement and, in conjunction therewith, entered a

"Clarifying Order" specifying that all the Direct Actions were barred under the Settlement Order.

*Id.* at 55. The bankruptcy court concluded that the Settlement Order was jurisdictionally sound

because it "sought to protect a valuable asset of the bankruptcy estate – Manville's insurance

contracts," and noted that the Second Circuit in *MacArthur* had already determined that the

bankruptcy court had jurisdiction to enter the Settlement Order. *Id.* at 59.

The district court affirmed the bankruptcy court's ruling and "labeled the Direct Action

Claims as 'creatively pleaded attempts to collect *indirectly* against the Manville insurance

policies.'" *Id.* at 59. Relying on *MacArthur* and *Davis,*[9] the district court held that:

> suits that seek direct recovery authorized by state statutes from
> Travelers' insurance policies would reduce the estate's recovery
> from those policies, thus affecting the 'property of the estate.' *Id.*
> at 61.

As a result, "[w]ithout considering the possibility of variations among these state law based

claims," the district court concluded that the bankruptcy court had jurisdiction to enjoin all the

Direct Actions. *Id.*

On appeal, the non-settling plaintiffs in the Direct Actions argued that the bankruptcy

court:

---

[9] *In re Davis,* 730 F.2d 176, 183-84 (5th Cir. 1984) (per curiam), a Fifth Circuit case, discussed *infra,* considered the application of the 1986 Orders to Direct Actions filed in Louisiana. *Manville III,* 517 F.3d at 61.

> failed to properly distinguish between (a) claims that seek to
> recover directly from Travelers for Travelers' separate acts and (b)
> true Direct Action suits that seek to recover from an insurer
> contractually obligated to indemnify Manville for its misconduct.
> *Id.* at 60.

They asserted, therefore, that the bankruptcy court lacked subject matter jurisdiction to enjoin the

Direct Actions in the Clarifying Order that were not limited by the terms or scope of Travelers'

insurance policies, did not seek recovery from Manville's policies, and alleged independent

misconduct by Travelers. *Id.* at 55. Travelers argued that the bankruptcy court merely enforced

the Settlement Order when it entered the Clarifying Order and that the jurisdictional basis for the

Settlement Order previously had been upheld by the Second Circuit in *MacArthur*. *Id.* at 60.

The Second Circuit stated at the outset that "the bedrock jurisdictional issue in this case

requires a determination as to whether the bankruptcy court had jurisdiction over the disputed

statutory and common law claims." *Id.* at 61. The court ultimately determined that the

jurisdictional analysis undertaken by both the bankruptcy court and district could fell short for

several reasons. *Id.* at 62.

The court initially found significant distinctions in the two cases relied upon by the

district court – *MacArthur* and *Davis* – from *Manville III*. *Id.* at 62-63. In *MacArthur,* as

discussed *supra*, MacArthur intended to pursue its vendor endorsement claims directly against

the insurers in connection with Manville's insurance policy. *Id.* at 62. MacArthur did not allege

that the insurers had independently engaged in wrongful conduct and, instead, sought to collect

"out of the proceeds of Manville's insurance policies on the basis of Manville's conduct." *Id.*

(quoting *MacArthur*, 837 F.2d at 92-93).

In *Davis*, the Fifth Circuit considered whether the district court had abused its discretion

in staying certain litigation following the entry of an order by the *Johns-Manville* bankruptcy

court staying all nationwide litigation pending against the debtor and its insurers. *In re Davis*,

730 F.2d 176, 179-81 (5th Cir. 1984). As part of its determination, the Fifth Circuit analyzed

whether the bankruptcy court had jurisdiction to stay the district court litigation filed by asbestos

workers against Travelers "under a Louisiana statute that afforded injured persons 'a right of

direct action against the insurer within the terms and limits of the policy [that] may be brought

against the insurer alone, or against both the insured and insurer jointly and in solido.'"[10]

*Manville III,* 517 F.3d at 62 (quoting *Davis,* 730 F.2d at 178). The court noted that the Louisiana

direct action statute in *Davis* did not:

> [c]reate an independent cause of action against the insurer, it
> merely grant[ed] a procedural right of action against the insurer
> where the plaintiff had a substantive cause of action against the
> insured. *Id.* at 62 (citations omitted) (internal quotation marks
> omitted).

As a result, the Fifth Circuit held that the bankruptcy court had jurisdiction to stay the Louisiana

direct action litigation, because such litigation threatened the integrity of the Johns-Manville

bankruptcy estate and the Travelers insurance policy served as a "bulwark against erosion of the

estate." *Davis,* 730 F.2d at 184-85.

The Second Circuit found that the claims raised in *Manville III* were significantly

different than the vendor endorsement claims in *MacArthur* and the direct action insurer claims

in *Davis* because, unlike those claims: (1) the plaintiffs in *Manville III* sought damages that were

entirely unrelated to Manville's insurance policy and the related proceeds; and (2) the claims in

*Manville III* were not based upon Manville's conduct. *Manville III,* 517 F.3d at 63.

The Second Circuit also criticized the bankruptcy and district courts for only viewing:

> the jurisdictional inquiry as a factual one: if the direct actions
> 'arose out of' or are 'related to' the Manville–[insurer]
> relationship, then the court had jurisdiction. But the factual
> determination was only half of the equation. The nature and extent

---

[10] The plaintiffs in *Davis* had petitioned the Fifth Circuit for a writ of certiorari to obtain relief from the Louisiana
district court's stay order. *Davis,* 730 F.2d at 177.

> of [the insurer's] duty to the Direct Action plaintiffs is a function of
> state law. *Neither court looked to the laws of the states where the*
> *claims arose to determine if indeed [the insurer] did have an*
> *independent legal duty in its dealing with plaintiffs,*
> *notwithstanding the factual background in which the duty arose.*
> *Id.* (emphasis added).

Accordingly, the Second Circuit turned to the various state law claims raised in the Direct

Actions to determine if Travelers owed an independent legal duty to the plaintiffs

notwithstanding the common factual background in which the duty arose. *See id.* at 63-65.

The court initially reviewed the statutory claims of the plaintiffs in West Virginia who

sought "[d]amages for aggravation, inconvenience and frustration" based upon Travelers'

alleged violations of West Virginia's Unfair Trade Practices Act. *Id.* at 63. The Supreme Court

of Appeals of West Virginia had previously held that attorney's fees and punitive damages could

be recovered for such violations. *Id.* The Second Circuit also noted that, under West Virginia

law, "settlement of the underlying tort case against the tortfeasor does not preclude a separate

and independent recovery against the tortfeasor's insurer arising out of its alleged bad faith

insurance practices." *Id.* at 64. Accordingly, the Second Circuit concluded that those claims

constituted "independent tort actions." *Id.*

The court again stressed the importance of determining how a state defines the type of

claim filed against a third party and turned to the claims raised by the plaintiffs in *Davis. Id.* The

court found that the claims filed by the plaintiffs in the Louisiana district court against Travelers

were based upon a Louisiana statute which provided a direct action against an insurer when the

insured was insolvent. *Id.* The court noted that the statute allowed recovery against Manville's

insurance policy and was limited to the coverage under such policy. *Id.* The Second Circuit

therefore concluded that, "[t]o the extent the Clarifying Order limits claims based on that

Louisiana statute[,] the order is on sound jurisdictional ground." *Id.*

The court ultimately found, however, that the majority of state claims raised in the Direct

Actions more closely resembled the claims in the Fifth Circuit case *Feld v. Zale Corp. (In re*

*Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995). *Id.* In that case, the debtor and its insurer sought to

enjoin bad faith tort claims that the debtor's excess insurance carrier intended to file against the

debtor's insurer. *Id.* The Fifth Circuit ultimately concluded that the bankruptcy court had no

jurisdiction over the tort claims, because the parties involved in such litigation were not debtors,

the tort claims were not property of the estate, and, if the excess carrier prevailed on the tort

claims, the proceeds would be payable directly from the insurer's assets, and not the proceeds

under the debtor's insurance policy. *Id.* at 65 (quoting *Zale Corp.*, 62 F.3d at 756-57).

Based upon the foregoing, the Second Circuit concluded that the bankruptcy court did not

have jurisdiction to enjoin "third-party non-debtor claims" in the Clarifying Order that sought to

recover directly from an insurer of Manville based upon the "insurer's own independent

wrongdoing." *Id.* The court explained that, "as in *Zale*, Plaintiffs seek to recover directly from a

debtor's insurer for the insurer's own independent wrongdoing...[,] aim to pursue the assets of

Travelers...[,] raise no claim against Manville's insurance coverage...[,] make no claim against

an asset of the bankruptcy estate, nor do their actions affect the estate." *Id.*

The Second Circuit also addressed the district court's broad interpretation of the

bankruptcy orders to enjoin the Direct Actions, which was based upon the bankruptcy court's

conclusion that "insurers would not contribute funds [to the Manville Trust] without receiving

assurances that any liabilities arising from or relating to their insurance relationships with

Manville would be fully and finally resolved." *Id.* at 66 (citations omitted). The Second Circuit

found that:

> [i]t was inappropriate for the bankruptcy court to enjoin claims
> brought against a third-party non-debtor solely on the basis of that

> third-party's financial contribution to a debtor's estate. If that were
> possible 'a debtor could create subject matter jurisdiction over any
> non-debtor third-party by structuring a plan in such a way that it
> depended upon third-party contributions. As we have made clear,
> subject matter jurisdiction cannot be conferred by consent of the
> parties. Where a court lacks subject matter jurisdiction over a
> dispute, the parties cannot create it by agreement even in a plan of
> reorganization.' *Id.* (quoting *In re Combustion Eng'g, Inc.,* 391
> F.3d 190, 228 (3d Cir. 2004)) (citation and quotation marks
> omitted).

Based upon the foregoing, the Second Circuit concluded that "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *Id.* The Second Circuit "recognized that conclusion as the decisional pivot" in *MacArthur* and *Davis,* noting that where "third parties [sought] to collect out of the *proceeds* of Manville's insurance policies on the basis of Manville's conduct…[,] plaintiffs' claims are inseparable from Manville's own insurance coverage and are consequently well within the Bankruptcy Court's jurisdiction over Manville's assets." *Id.* (quoting *MacArthur,* 837 F.2d at 92-93).

The Second Circuit also dismissed the district court's reliance upon the bankruptcy court's extensive factual findings that "Travelers learned virtually everything it knew about asbestos from its relationship with Manville" and that "the Direct Action Claims against Travelers 'inescapably' relate to its insurance relationship with Manville." *Id.* at 67 (citations omitted). The court explained that the factual origins of Travelers' alleged misconduct were only part of the liability equation:

> What remained was a legal determination: *did Travelers owe a
> duty to the Direct Action Plaintiffs independent of its contractual
> obligations to indemnify those injured by the tortious conduct of
> Manville?* If such a duty exists, then the fact that it arises from a
> common nucleus of operative facts involving Travelers and
> Manville (*e.g.*, the Manville/Travelers insurance relationship) is of
> little significance from a jurisdictional standpoint. As noted above,

31

drawing the duty line is a function of state and not federal law. *Id.*
(emphasis added) (citations omitted).

Finally, the Second Circuit confirmed that its approach was consistent with the

channeling injunction recently established by Congress under § 524(g), which must be

interpreted in the same manner such that third-party litigation cannot be enjoined unless "a third

party has derivative liability for the claims against the debtor." *Id.* at 67-68 (quoting *In re*

*Combustion Eng'g, Inc.*, 391 F.3d at 234). The court therefore concluded that, because "the

claims at issue here…are not derivative of Manville's liability, but rather seek to recover directly

from [the insurer] for its own alleged misconduct…and have no effect on the *res*, they are

outside the limits of § 524(g)." *Id.* at 68.

### d. *Manville IV*

The Supreme Court subsequently granted a petition for certiorari in *Manville III* and,

although it did not dispute that the Direct Action claims were nonderivative, it concluded that the

Clarifying Order did not improperly expand the scope of the 1986 Orders to enjoin the Direct

Actions because the broad "definition of 'Policy Claims' [in the 1986 Orders] contains nothing

limiting it to derivative actions."[11] *Bailey*, 557 U.S. at 149. In particular, the Court found that,

because there was an exception in the injunction in the 1986 Orders which specifically carved

out application to any "claim *previously* brought against a settling insurer 'seeking any and all

damages (other than or in addition to policy proceeds) for bad faith or other insurer misconduct

alleged in connection with the handling or disposition of the claims,'" there was an implication

that those types of claims filed *after* the entry of the 1986 Orders were barred by such injunction.

*Id.* at 150 (quoting App. to Pet. for Cert. in No. 08-295, at 446a) (emphasis added). The Court

---

[11] "Policy Claims" is defined in the 1986 Orders as "claims, demands, allegations, duties, liabilities and obligations" against Travelers, known or unknown at the time, "based upon, arising out of or relating to" Travelers' insurance coverage of Manville. *Bailey*, 557 U.S. at 148 (citing App. to Pet. for Cert. in No. 08-295, at 439a).

therefore concluded "that this same sort of claim brought after the 1986 Orders become final will

be barred" because "[t]here would have been no need for this exception if 'Policy Claims' were

limited to claims against Travelers for Manville's wrongdoing." *Id.* The Court also held that,

despite evidence that Travelers and others "understood the proposed injunction to bar only

claims derivative of Manville's liability... where the plain terms of a court order unambiguously

apply, as they do here, they are entitled to their effect." *Id.*

 The Court also held that:

> once the 1986 Orders became final on direct review [in
> *MacArthur]* (whether or not proper exercises of bankruptcy court
> jurisdiction and power), they became res judicata to the 'parties
> and those in privity with them, not only as to every matter which
> was offered and received to sustain or defeat the claim or demand,
> but as to any other admissible matter which might have been
> offered for that purpose.' *Id.* at 152 (citations omitted).

Accordingly, the Court held that the issue of whether the bankruptcy court had jurisdiction to

enjoin claims in the Settlement Order was not properly before the Second Circuit in *Manville III*,

nor was it properly before the Court. *Id.* at 148.

 The Court emphasized that its holding was "narrow," and that it would "not resolve

whether a bankruptcy court, in 1986 or today, could properly enjoin claims against nondebtor

insurers that are not derivative of the debtor's wrongdoing." *Id.* at 155. It did recognize, however,

that "[o]n direct review today, a channeling injunction of the sort issued by the Bankruptcy Court

in 1986 would have to be measured against the requirements of § 524..." *Id.* Leaving the

*Manville III* jurisdictional analysis untouched, the Court reversed and remanded the case to the

Second Circuit to decide whether certain parties were bound by the 1986 Orders based upon due

process concerns. *Id.* at 155-56.

 In *Manville IV*, the Second Circuit determined that Direct Action claimants who were not

adequately represented in the bankruptcy court and did not receive adequate notice of the 1986

Orders were not bound by the 1986 Orders and permitted to collaterally attack such orders as

jurisdictionally void. *Manville IV,* 600 F.3d at 158. As part of this determination, the Second

Circuit reaffirmed its jurisdictional analysis in *Manville III* that the bankruptcy court improperly

interpreted the 1986 Orders:

> to enjoin not only claims that are directed at the Travelers
> insurance policies in the *res* of the Manville estate, but also non-
> derivative claims by [the Direct Action claimants] that seek to
> impose liability on Travelers separately. The bankruptcy court, in
> essence, interpreted the [Settlement Order] to have an *in personam*
> effect. *Id.* at 153.

The Second Circuit further confirmed that its analysis was correct based upon the 1994

enactment of § 524(g):

> [t]ellingly, although Congress codified a version of the bankruptcy
> court's 1986 channeling injunction at 11 U.S.C. § 524(g)...the
> statute does not authorize injunctions of these sorts of claims
> against non-debtor third parties. Rather, section 524(g) only
> 'limits the situations where a channeling injunction may enjoin
> actions against third parties to those where a third party has
> derivative liability for the claims against the debtor.' *Id.* (quoting
> *In re Combustion Eng'g, Inc.,* 391 F.3d at 234).

Ultimately, the Second Circuit held that the 1986 Orders were jurisdictionally void as to those

Direct Action claimants who were not adequately represented in the bankruptcy proceedings

when the 1986 Orders were issued and did not receive adequate notice of the 1986 Orders. *Id.* at

158.

The takeaway from the *Johns-Manville* cases is that bankruptcy courts generally do not

have jurisdiction over nonderivative claims, and channeling injunctions established under

§ 524(g) do not apply to nonderivative claims. Under *MacArthur,* a claim against an insurer is

deemed derivative if the claim: (1) seeks recovery from the debtor's insurance policy, because

such policy constitutes the debtor's *res*; and (2) is based upon the debtor's conduct, not the

insurer's conduct. Under *Manville III,* in deciding whether a claim against an insurer is

derivative, a court should not just consider the factual background of a claim; rather, it must determine whether the insurer owes a duty to the plaintiff under state law which is *independent* of the insurer's contractual obligations to the debtor to indemnify those injured by the debtor's conduct.

Finally, as confirmed in *Manville IV,* the Supreme Court's holding in *Bailey* has no impact on the Second Circuit's jurisdictional analysis in *Manville III.* In *Bailey,* the Court merely held that Direct Action claimants who were adequately represented and properly served with the bankruptcy court's 1986 Orders were barred by res judicata from challenging the bankruptcy court's jurisdiction to enter the 1986 Orders. The Supreme Court remanded the case to the Second Circuit to determine whether the remaining Direct Action claimants raised valid due process concerns in connection with the 1986 Orders and, if so, whether the bankruptcy court had jurisdiction to enjoin such claims.

On remand in *Manville IV,* the Second Circuit concluded that the due process concerns raised by the remaining Direct Action claimants were valid and confirmed the entirety of its jurisdictional analysis in *Manville III* with regard to their claims. Specifically, the Second Circuit held that, although the bankruptcy court had *in rem* jurisdiction over the insurer's policy (because such policy constitutes the debtor's *res*), the bankruptcy court did not have *in personam* jurisdiction over the insurer itself. As a result, the bankruptcy court did not have jurisdiction over the remaining Direct Action claimants' nonderivative claims against the insurers. Going beyond the jurisdictional challenge, the Second Circuit also confirmed that, had the channeling injunction under § 524(g) been created prior to the *Johns-Manville* cases, it only would have applied to derivative claims and, therefore, would not have applied to the nonderivative claims at issue in *Manville IV.*

### 4. *Quigley* Factual Background

Turning back to the facts in *Quigley*, the debtor, Quigley, manufactured a product called

Insulag, which contained asbestos. *In re Quigley Co., Inc.* ("*Quigley*"), 676 F.3d 45, 47 (2d Cir.

2012). Pfizer subsequently acquired Quigley and began to use its own name, logo, and trademark

in connection with marketing materials for Insulag. *Id.* Numerous asbestos-related suits

eventually were filed against both Quigley and Pfizer and, in 2004, Quigley filed a Chapter 11

bankruptcy case. *Id.*

A fact in this case that ultimately was critical to the court's jurisdictional analysis was

that Quigley and Pfizer shared a number of insurance policies, as well as an insurance trust under

which both Quigley and Pfizer were joint beneficiaries. *Id.* The bankruptcy court initially issued

a preliminary injunction against all parties "from taking any action in any and all pending or

future Asbestos Related Claims against Pfizer during the pendency of Quigley's chapter 11

case." *Id.* at 47-48. The bankruptcy court subsequently modified the preliminary injunction to

track the language in § 524(g)(4)(A)(ii) and prohibited all litigation against Pfizer alleging:

> that Pfizer is directly or indirectly liable for the conduct of, claims
> against, or demands on Quigley to the extent such alleged liability
> of Pfizer arises by reason of [] Pfizer's ownership of a financial
> interest in Quigley, a past or present affiliate of Quigley, or a
> predecessor in interest of Quigley... *Id.* at 48.

At the time, multiple lawsuits were pending against Pfizer in Pennsylvania alleging that

the plaintiffs ("PA Plaintiffs") were injured by exposure to asbestos, including claims that Pfizer

was liable under an "apparent manufacturer" theory of liability under § 400 of the Restatement

(Second) of Torts ("Tort Claims"). *Id.* at 49. After the PA Plaintiffs moved for partial summary

judgment against Pfizer, Pfizer moved in the bankruptcy court to enforce the preliminary

injunction against the PA Plaintiffs. *Id.*

The bankruptcy court found that the alleged liability of Pfizer under the Tort Claims was derivative of Quigley's liability and, therefore, enjoined the Tort Claims pursuant to the preliminary injunction. *Id.* at 49-50. The district court reversed based upon its determination that the Tort Claims were not derivative, since the PA Plaintiffs had alleged that Pfizer breached an independent duty owed to them, and allowed the Tort Claims to proceed in state court. *Id.* at 50.

On appeal, the PA Plaintiffs argued that, *inter alia*, the bankruptcy court lacked jurisdiction to enjoin the Tort Claims because the Tort Claims were nonderivative claims, since the claims alleged state "violations of an independent legal duty owed by Pfizer" to the PA Plaintiffs. *Id.* at 54. In resolving this, the Second Circuit considered whether it was required to use the derivative liability inquiry to determine whether the bankruptcy court had jurisdiction over such claim. *See id.* at 54-55. In making its determination, the court undertook a comprehensive analysis of the role that derivative liability plays in the determination of bankruptcy jurisdiction by analyzing the *Johns-Manville* cases discussed *supra. Id.* at 54-58.

### 5. *Quigley* Analysis of Derivative Liability Issues in *Johns-Manville* Cases

The Second Circuit in *Quigley* ultimately concluded that, although it had used the derivative liability inquiry in *MacArthur, Manville III, and Manville IV* as a tool to assist it in determining whether the bankruptcy court had jurisdiction over a claim, it was not *required* to use the derivative liability inquiry whenever the bankruptcy court's jurisdiction was challenged. *Id.* at 57-58. However, the derivative liability inquiry is instrumental in determining whether the channeling injunction under § 524(g) will enjoin a claim. The court also recognized that determining whether a bankruptcy court has jurisdiction over a claim is a broader inquiry than determining whether such claim affects the *res* of the bankruptcy estate. *Id.* at 57.

The Second Circuit clarified that, in *MacArthur,* it did not hold that bankruptcy courts

lack jurisdiction over nonderivative third-party litigation that affects the *res* of the bankruptcy

estate. *Id.* at 55. If it had, such language would have been dicta, because the claims in that case

were determined to be derivative and, therefore, the bankruptcy court had jurisdiction over such

claims. *Id.*

The *Quigley* court confirmed that, by using the derivative liability inquiry in *MacArthur*

to determine whether the claims would affect the *res* of the bankruptcy estate, the court did not

set forth "an independent requirement for the exercise of jurisdiction." *Id.* at 55. Rather, it merely

used the derivative liability inquiry as a tool to assist it in determining whether the bankruptcy

court had jurisdiction over the third-party litigation.[12] *See id.* The Second Circuit concluded:

> [t]he fact that MacArthur's rights under the vendor endorsements
> were derivative of Manville's—as opposed to non-derivative rights
> under separate insurance policies—indicated in that case that any
> proceeds Manville's insurers might owe MacArthur would come
> from Manville's insurance policies. *Id.*

The Second Circuit also confirmed that *Manville III* did not represent a change in its

jurisprudence and that "[a]fter *Manville III*, as before it, 'a bankruptcy court...has jurisdiction to

enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate.'" *Id.* at

56 (quoting *Manville III*, 517 F.3d at 66) (citing *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114

(2d Cir. 1992)). The court went on to find that:

> the salience of *Manville III*'s inquiry as to whether [the insurer's]
> liability was derivative of the debtor's rights and liabilities was
> that, in the facts and circumstances of *Manville III*, cases alleging
> derivative liability would affect the *res* of the bankruptcy estate,
> whereas cases alleging non-derivative liability would not...The
> *Manville III* panel thus quite properly used the derivative/non-
> derivative inquiry as a means to assess whether the suits at issue
> would affect the bankruptcy estate. It did not impose a requirement

---

[12] As discussed *supra*, the court viewed the similarity of MacArthur's vendor endorsement claims to direct actions against insurers as relevant to whether MacArthur's claims affected the bankruptcy estate. *Quigley,* 676 F.3d at 55.

that an action must both directly affect the estate *and* be derivative
of the debtor's rights and liabilities for bankruptcy jurisdiction over
the action to exist. *Id.* at 56-57.

The *Quigley* court also found that *Manville IV* recognized that derivative liability was not

discussed in *Manville III* "as an independent jurisdictional requirement but as a factor

demonstrating, in the circumstances of that litigation, that the suits in question would have an

effect on the bankruptcy *res.*" *Id.* at 57. It described its holding as indicating "that the bankruptcy

court's *in rem* jurisdiction was insufficient to allow it to enjoin ... [a]ctions based on state-law

theories that [sought] to impose liability on Travelers as a separate entity rather than on the

policies that it issued to Manville." *Id.* (quoting *Manville IV*, 600 F.3d at 152). Thus, *Manville III*

"drew a distinction between suits alleging non-derivative liability on the one hand, and suits

affecting the *res* on the other. By identifying the suits in question as non-derivative, the *Manville*

*III* panel determined that they would not affect the bankruptcy estate." *Id.*

Based upon the foregoing, the court in *Quigley* determined that;

while we have treated whether a suit seeks to impose derivative
liability as a helpful way to assess whether it has the potential to
affect the bankruptcy *res*, the touchstone for bankruptcy
jurisdiction remains whether its outcome might have any
'conceivable effect' on the bankruptcy estate. *Id.* (citations
omitted) (internal quotation marks omitted).

The Second Circuit thus concluded that the underlying framework for determining whether

jurisdiction exists (*i.e.*, whether a claim could have a conceivable effect on the estate) is separate

from and broader than the derivate liability inquiry (*i.e.*, whether a claim will affect the *res* of the

bankruptcy estate), although the two issues can be "intertwined." *Id.* at 57-58. As a result, the

court held that bankruptcy jurisdiction may exist over nonderivative claims against third parties

in certain limited instances. *Id.* at 57.

Ultimately, the Second Circuit concluded that it did not need to determine whether the Tort Claims were derivative claims in order to resolve whether the bankruptcy court had jurisdiction. *See id.* at 53-54, 58. Rather, it separately concluded that the bankruptcy court had jurisdiction over such claims, reasoning that if the PA Plaintiffs prevailed on their Tort Claims against Pfizer, they would be entitled to immediately draw down on the debtor's insurance policies, because Pfizer was a joint beneficiary with Quigley under such policies. *Id.* at 58. ("[W]here litigation of the [PA Plaintiffs'] suits against Pfizer would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate.").

After the court determined that the bankruptcy court had jurisdiction to enjoin the Tort Claims, it addressed whether the Tort Claims fell within the scope of the channeling injunction created pursuant to § 524. *Id.* As discussed *infra*, the court ultimately held that the Tort Actions were not subject to the channeling injunction under § 524 because the PA Plaintiffs lacked the necessary statutory relationship required under § 524(g)(4)(A)(ii)(I). *Id.* at 59-62. Accordingly, the court did not have to determine whether the Tort Claims were derivative under § 524(g)(4)(A)(ii). *Id.* at 62.

Against this backdrop, the court turns to whether the Montana Claims are derivative claims which should be enjoined by the Channeling Injunction established under § 524(g).

## IV.    Analysis of Montana Claims and Derivative Liability

The Third Circuit has instructed this court to review the law relevant to the Montana Claims in order to determine whether CNA owed a duty to the Montana Plaintiffs which was independent of CNA's contractual indemnification obligations under the CNA Policies with respect to those injured by Grace's conduct. *Carr,* 900 F.3d at 137. At the outset, the court

recognizes that the Montana Claims have been filed in Montana state court and only allege tort claims arising under Montana law. The court therefore concludes, and all of the parties agree, that Montana law is the relevant law applicable to the Montana Claims. *See* Appellees' Br. on Remand 12; Appellants' Br. on Remand 15. The Montana Plaintiffs have alleged two tort claims against CNA under Montana law- negligence and breach of duty to warn. Appellants' Br. on Remand 20.

### A. Negligence and Breach of Duty to Warn Claims

All of the parties agree that, in order to establish a claim of negligence against CNA, the Montana Plaintiffs must demonstrate the following elements: (1) CNA had a legal duty to the Montana Plaintiffs; (2) CNA breached that legal duty; (3) CNA's breach of the legal duty caused injury to the Montana Plaintiffs; and (4) damages. *See* Appellees' Br. on Remand 13; Appellants' Br. on Remand 21. The parties also agree that the element upon which this court's determination hinges is the first element, the basis of CNA's legal duty. Although the parties set forth different legal theories as the basis of CNA's legal duty, the standards under each of the parties' legal theories are virtually identical.

CNA asserts (and up until recently, the Montana Plaintiffs asserted)[13] that CNA's legal duty to the Montana Plaintiffs arose under § 324A of the Restatement (Second) of Torts ("Restatement").[14] Appellees' Br. on Remand 14. Under this legal theory, if the Montana

---

[13] In fact, it appears that the Montana Plaintiffs previously argued that CNA's current legal theory, § 324A of the Restatement (Second) of Torts, was the proper legal theory to apply to CNA. *See* Appellees' Br. on Remand 14 (citing *W.R. Grace*, 2016 WL 6068092, at *12 (noting that the Montana Plaintiffs "assert [that their claims] arise under Section 324A.")); Defs.' Mem. of Law (D.I. 9) at 36, nn. 73-74; Appellants' Br. 4, n. 13, in No. 17-1208 (3d Cir., filed July 31, 2017)).

[14] § 324A of the Restatement (Second) of Torts, which governs liability to third persons for negligent performance of an undertaking, provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to

41

Plaintiffs prove that: (1) CNA should have recognized that providing industrial hygiene services to Grace was necessary for the protection of the Montana Plaintiffs; and (2) the Montana Plaintiffs were harmed by their reliance upon CNA's provision of such services, then CNA owed a duty of reasonable care to the Montana Plaintiffs. *See id.* at 15, 17.

The Montana Plaintiffs argue that, although the Restatement may provide the basis for an insurer's legal duty in the future, the Montana Supreme Court has not yet adopted the Restatement. Appellants' Br. on Remand 27. As a result, they assert that the Montana common law of negligence should be applied to determine CNA's legal duty ("Negligence Standard"), which provides: "[w]hen a professional undertakes by contract to provide services to someone the professional has a duty of care to third parties who foreseeably may be injured as a result of the professional's negligence." *Id.* at 21-22.

CNA also argues that the Restatement governs the Montana Plaintiffs' breach of duty to warn claims, but provides no analysis of such claims under the Restatement in any of its briefs to this court. The Montana Plaintiffs argue that the elements of their breach of duty to warn claim ("Duty to Warn Standard" and, collectively with the Negligence Standard, the "Common Law Standards") are: "(1) either (a) engagement by the defendant with a hazard, including acquisition of superior knowledge thereof of which others are unaware, or (b) relationship or position with respect to foreseeable victims and a hazard which invokes public policy expectation of warning, and (2) foreseeability of injury to those others if they are not warned." *Id.* at 24-25.

---

liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

CNA asserts that the Montana Claims are derivative because "the Montana Plaintiffs' alleged 'physical harms' and their need for 'protection' under § 324A are both dependent on Grace's wrongdoing because both stem directly from dangers created by Grace's Libby operations." Appellees' Br. on Remand 17. Essentially, CNA argues that the Montana Claims are derivative because the Montana Plaintiffs would not have sustained injuries "but for" Grace's misconduct. However, the Third Circuit has already held that the fact that "a debtor's product caused a plaintiff's injury is not enough to render a third party liable 'for the conduct of, claims against, or demands on the debtor.'" *Carr,* 900 F.3d at 137.

In addition, CNA's argument only focuses on the "factual origins" of the Montana Claims, without any consideration of the legal determination required by the Third Circuit. As observed by the Second Circuit in *Manville III,* if Travelers had a legal duty under state law which was independent of its contractual obligations to Manville under its insurance policies, "then the fact that [the duty] arises from a common nucleus of operative facts involving Travelers and Manville (*e.g.,* the Manville/Travelers insurance relationship) is of little significance…" *Manville III,* 517 F.3d at 67. That the underlying injuries of the Montana Plaintiffs were caused by Grace and arose out of Grace's insurance relationship with CNA, therefore, is of little significance to the legal determination that this court must make, and is insufficient to render the Montana Claims derivative.

Finally, CNA's argument is inconsistent with the holding in *Tronox,* where the Second Circuit specifically recognized that the plaintiffs would have had a nonderivative claim against NewCo if they had alleged that NewCo had been negligent in its supervision of the cleanup of the toxic site. In that instance, the plaintiffs' underlying injuries would have been caused by the debtor, not NewCo, but that would not have rendered the plaintiffs' negligence claims derivative.

43

On remand, this court must make the following legal determination: did CNA owe a duty to the Montana Plaintiffs independent of its contractual obligations to Grace under the CNA Policies to indemnify those injured by Grace's tortious conduct? With respect to this determination, the court holds that, regardless of whether the Restatement or the Common Law Standards applies, CNA's legal duty to the Montana Plaintiffs under Montana law is completely independent of CNA's contractual duties to Grace under the CNA Policies. Under the Restatement, CNA independently owed a duty of reasonable care to the Montana Plaintiffs to the extent that the Montana Plaintiffs can prove in state court that: (1) CNA should have recognized that providing industrial hygiene services to Grace was necessary for the protection of the Montana Plaintiffs; and (2) the Montana Plaintiffs were harmed by their reliance upon CNA's provision of such services. Under the Negligence Standard, CNA owed a duty of reasonable care to the Montana Plaintiffs to the extent that the Montana Plaintiffs can prove in state court that it was foreseeable that the Montana Plaintiffs could have been injured by CNA's negligence in providing industrial hygiene services.

Completely independent of CNA's duty to the Montana Plaintiffs under the Restatement or the Negligence Standard, CNA also had a contractual indemnification obligation to Grace under the CNA Policies with respect to the claims of those individuals who were injured by Grace's conduct. Accordingly, CNA's duty under Montana law to the Montana Plaintiffs, in connection with the negligence claim, is completely independent of its contractual duty to Grace and is based upon allegations of CNA's misconduct, not Grace's misconduct.

Under the Duty to Warn Standard, CNA owed a duty to the Montana Plaintiffs to the extent that they can prove in Montana state court that CNA was either: (1) engaged with a hazard; or (2) in a position with respect to the foreseeable victims and a hazard which invokes

44

the public policy expectation of warning; and that it was foreseeable that the Montana Plaintiffs would be injured if CNA did not warn them of the danger of such hazard. This duty under Montana law exists independent of CNA's contractual obligations to Grace and, like the negligence claim, is based upon allegations of CNA's misconduct, not Grace's misconduct.

In addition, it is clear that Grace has no right to sue CNA for negligence or breach of a duty to warn under the Restatement or the Common Law Standards. The Restatement and the Common Law Standards establish duties that are owed to *third parties*. As a result, the Montana Plaintiffs' right to sue CNA on account of the Montana Claims is <u>not</u> based upon Grace's right to sue CNA and, therefore, does not constitute a derivative claim under the analysis in *Tronox*.

Furthermore, under the derivative liability inquiry in *MacArthur, Manville III*, and *Manville IV,* the litigation over the Montana Claims will have no effect on the *res* of Grace's bankruptcy estate. If the Montana Plaintiffs prevail on either their negligence or duty to warn claims in Montana state court, the Montana Plaintiffs will hold a judgment against CNA, not Grace. As a result, the Montana Plaintiffs will only be able to execute against CNA's *own* assets, *not Grace's assets.* Clearly, CNA's assets are not part of the *res* of Grace's bankruptcy estate.[15]

In addition, as discussed *supra,* the Montana Claims are based upon CNA's conduct – CNA's alleged negligence in providing industrial hygiene services and/or CNA's failure to warn

---

[15] CNA argues that "the type of tort claims asserted here have the potential to affect the *res* of the estate because they undermine the incentive for insurers to settle and fund an asbestos trust." Appellees' Post-Hearing Suppl. Br. on Remand 16. Aside from the fact that this argument confuses the broader *Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir. 1984), test for determining jurisdiction with the narrower inquiry of whether the Montana Claims will affect the *res*, insurers still will have an incentive to settle and fund asbestos trusts. The court's holding in this case will only affect insurers who are alleged to have committed torts under their insurance policies. Section 524(g)(4)(A)(ii) was not intended to give insurers license to commit torts under their insurance policies and, in any case, bankruptcy courts do not have *in personam* jurisdiction over insurers. Rather, as previously discussed, bankruptcy courts only have *in rem* jurisdiction over the insurance policies. CNA also argues that, if the Montana Claims are not enjoined under § 524(g)(4)(A)(ii), the Montana Plaintiffs may obtain a double recovery on their claims if they prevail in the Montana state court and receive a distribution from the Trust. Appellees' Post-Hearing Suppl. Reply Br. on Remand 10. This hypothetical issue is not before the court and, in any event, if the Montana Plaintiffs are not legally entitled to receive a double recovery, CNA presumably will raise such argument at the appropriate time in the appropriate court.

the Montana Plaintiffs of certain hazards – not Grace's conduct. As a result, the Montana Claims

constitute nonderivative claims under the derivative liability inquiry in *MacArthur, Manville III,*

and *Manville IV.*

In conclusion, this court holds that, like the plaintiffs in *Tronox,* the Montana Plaintiffs

hold the following types of claims: (1) direct claims against Grace for asbestos injuries caused by

Grace's wrongdoing; (2) derivative claims against CNA arising under CNA's Policies which are

based upon Grace's rights to sue CNA under the CNA Policies; and (3) nonderivative claims

against CNA based upon CNA's alleged negligence in providing industrial hygiene services to

Grace and/or alleged breach of its duty to warn the Montana Plaintiffs about certain hazards. The

first two types of claims fall within the scope of the Channeling Injunction under

§ 524(g)(4)(A)(ii) and, therefore, may be enjoined. The last group of claims, however, is not

within the scope of the Channeling Injunction under § 524(g)(4)(A)(ii) and may proceed in

Montana state court.

## V.    Jurisdictional Observations

Before turning to the analysis of the statutory relationship issue in § 524(g)(4)(A)(ii)(III),

the court is compelled to briefly digress to address the Bankruptcy Court's holding that the

Montana Claims affect the *res* of Grace's bankruptcy estate and the related holding by the Third

Circuit that the Bankruptcy Court had jurisdiction to enjoin the Montana Claims. The

Bankruptcy Court found that the Montana Claims affect the *res* of Grace's bankruptcy estate

based upon the following explanation:

> [t]o the extent that CNA incurs any liability arising out of the
> Montana Claims, any required indemnification by the Debtors will
> affect the *res* of the Debtors' estate, i.e., the Settlement Amount
> being paid by CNA to the Asbestos PI Trust in accordance with the
> court-approved Settlement Agreement and Plan. The Montana
> Claims are based (albeit indirectly) only on Grace's products and

46

conduct; there is no need for the intervention of additional lawsuits to establish potential indemnification liability. *W.R. Grace*, 2016 WL 6068092, at *10.

It appears that the Bankruptcy Court concluded that the Montana Claims will affect the *res* because, under the Reimbursement Provision in the Settlement Agreement, the Trust will be required to reimburse CNA for part of any payment that CNA makes to the Montana Plaintiffs on account of the Montana Claims.

When the Bankruptcy Court made this finding, however, it appears to have utilized the broader jurisdictional standard under *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984). *See id.* Instead of looking at the actual effect that the Montana Claims will have on Grace's estate, the Bankruptcy Court used the broader *Pacor* test for determining "related to" jurisdiction and analyzed whether the Montana Claims will have a "conceivable effect" on the bankruptcy estate.[16] *See id.* at *10 n. 75 (citing *In re Combustion Eng'g, Inc.*, 391 F.3d at 231-32 and *Pacor Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) with respect to the scope of "related to" jurisdiction).

The Bankruptcy Court's holding prompted the Montana Plaintiffs, on appeal, to question the Bankruptcy Court's jurisdiction to enjoin the Montana Claims. *See Carr*, 900 F.3d at 138. The Third Circuit recognized that jurisdiction was not an issue before the Bankruptcy Court, but proceeded to "address the issue only briefly." *Id.* at 138-39. Citing *Combustion Engineering*, the Third Circuit stated that "related to" jurisdiction exists "over actions [against] non-debtors involv[ing] contractual indemnity obligations between the debtor and non-debtor that automatically result in indemnification liability against the debtor." *Id.* at 139. Based upon

---

[16] As discussed *supra*, this court already has determined that the Montana Claims do not affect the *res* because any recovery on account of the Montana Claims will result in a judgment entered against CNA which can only be executed against CNA's assets, not Grace's assets. *See supra* p. 46

the Trust's obligation to indemnify CNA under the Reimbursement Provision in the Settlement

Agreement, the Third Circuit concluded that the Bankruptcy Court had jurisdiction to enjoin the

Montana Claims. *Id.*

This court recognizes that a debtor's indemnification obligation can provide the basis for

subject matter jurisdiction over third-party claims in certain circumstances, as outlined in

*Combustion Engineering*. However, absent the Trust's indemnification obligation under the

Reimbursement Provision, neither Grace nor the Trust has any indemnification obligation to

CNA. If the Montana Plaintiffs prevail against CNA related to the Montana Claims, CNA will

not hold any independent right of indemnification against Grace or the Trust.

In *Combustion Engineering,* the Third Circuit considered whether the bankruptcy court

properly exercised "related to" jurisdiction over nonderivative claims against third parties, based

upon future contribution or indemnification claims held by third parties against the debtor. *In re

Combustion Eng'g, Inc.,* 391 F.3d at 230. In that case, the court noted that it had "rejected

'related to' jurisdiction over third-party claims involving asbestos or asbestos-containing

products supplied by the debtor when the third-party claim *did not directly result in liability for

the debtor.*" *Id.* at 231 (emphasis added).

As an example, it cited *Pacor*, which involved personal injury claims against third parties

for damages allegedly caused by asbestos which was manufactured by the debtor, but supplied

by the third party. *Id.* In *Pacor*, the Third Circuit ultimately held that there was no "related to"

jurisdiction because, even though the debtor manufactured the asbestos which caused the injuries

underlying the third-party claims, the "'primary action'-- *i.e.*, the suit between the two non-

debtors – would not, itself, result in an indemnification claim against the debtor." *Id.* (citing

*Pacor,* 743 F.2d at 995). Here, the Montana Claims will not, in and of itself, result in an indemnification claim against Grace or the Trust.

In addition, as discussed in *Manville III,* the Fifth Circuit faced this identical issue in *Zale Corp.* when it had to determine whether the bankruptcy court had jurisdiction over bad faith tort claims filed against the debtor's insurer. *Zale Corp.,* 62 F.3d at 751. In that case, the debtor had entered into a settlement agreement during the bankruptcy proceeding which settled all of the debtor's claims against the debtor's insurer arising under the debtor's directors and officers liability insurance policies and, *inter alia,* enjoined all claims against the debtor's insurer related to the settlement agreement. *Id.* at 749-50. As part of the settlement agreement, the debtor also agreed to indemnify its insurer for any bad faith or other claims filed against the insurer related to the settlement agreement. *Id.* at 750.

The debtor's excess liability insurer objected to the settlement agreement and the Fifth Circuit ultimately had to determine whether the bankruptcy court had jurisdiction over the excess liability insurer's bad faith tort claims against the debtor's insurer. *Id.* at 751. The Fifth Circuit held that, although indemnification can bring unrelated actions within the scope of a bankruptcy court's jurisdiction, "the claims at issue in those cases involved *the debtor's behavior,* thereby providing a basis for the debtor's obligation that was *independent* of the indemnification agreement." *Id.* at 755 (emphasis added). The court explained that the purpose of the indemnification agreement in those cases "was to eliminate the necessity for a formal suit against the debtor; therefore, the indemnification agreement satisfied a procedural goal, not a substantive one." *Id.*

In *Zale Corp.,* the bad faith tort claims against the debtor's insurer were only based upon the misconduct of the insurer, not the debtor. *Id.* at 756. The only connection between the bad

faith claims against the debtor's insurer and the debtor's estate was the debtor's agreement to indemnify the insurer for claims that could not be brought against the debtor, even indirectly. *Id.* Thus, in the absence of the indemnification agreement, the insurer had "no independent claim" against the debtor for indemnification, because it was the insurer's actions at issue, not the debtor's actions. *Id.* The Fifth Circuit determined that it had to resolve "whether, alone, [the debtor's] consent to the indemnification provision in the settlement can establish bankruptcy jurisdiction over the unrelated third-party claims." *Id.*

The Fifth Circuit looked to a case from the Eleventh Circuit, *Galluci v. Grant (In re Gallucci)*, 931 F.2d 738 (11th Cir. 1991), which held that the bankruptcy court improperly relied upon a bankruptcy compromise as the sole basis for its jurisdiction, because the bankruptcy court "had a duty to inquire into the compromise and determine if it actually impacted property of the estate or merely affected unrelated property." *Id.* Because the property involved in the settlement agreement "had no effect on the estate absent the compromise, the court held that the compromise failed to establish a basis for jurisdiction." *Id.* (citing *In re Gallucci*, 931 F.2d at 744). In that case, the "parties could not accomplish through settlement what they could not attain directly – that is, bankruptcy court jurisdiction over the property." *Id.* (citing *In re Gallucci*, 931 F.2d at 743 n. 16).

Applying the reasoning in *Galluci* to *Zale*, the Fifth Circuit found that, because the debtor's insurer and the debtor's excess liability insurer were not debtors and "the property at issue – the bad faith claims – is not property of the estate, the bankruptcy court would have no jurisdiction over the tort claims absent the indemnification provision in the settlement." *Id.* In addition, since the tort claims against the insurer did not implicate an independent obligation of the debtor in favor of the insurer, "no substantive basis for indemnification exists" outside of the

indemnification agreement. *Id.* Based upon the foregoing, the Fifth Circuit held that the settlement agreement did not "provide the basis for jurisdiction over the bad faith claims." *Id.*

Applying these principles to the case at hand, the court observes that, outside of the Reimbursement Provision, neither the Trust nor Grace has *any* liability to CNA in connection with the Montana Claims so there is no substantive basis for indemnification against the Trust or Grace. In other words, the "primary action" in this case (the litigation over the Montana Claims) does not, in and of itself, give rise to *any* claim in favor of CNA against Grace or the Trust.

Thus, other than Grace's consent to have the Trust indemnify CNA for the Montana Claims, the Bankruptcy Court had no basis to assert "related to" jurisdiction over the Montana Claims. Although CNA provided $84 million to the Trust in connection with the Settlement Agreement, the Third Circuit has already held in *Combustion Engineering* that financial contributions alone "do not provide a sufficient basis for exercising subject matter jurisdiction" because, if they did, "a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions." *In re Combustion Eng'g, Inc.,* 391 F.3d at 228. The Third Circuit emphasized that "[a]s we have made clear, '[s]ubject matter jurisdiction cannot be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.'" *Id.* (citations omitted).

In addition, under the analysis in *Zale Corp.*, neither the Montana Plaintiffs nor CNA are debtors in this case and the property at issue (the Montana Claims) is not property of the estate. Because neither the Trust nor Grace has any independent liability to CNA under the Montana Claims, the only basis for the Bankruptcy Court's jurisdiction over the Montana Claims is the Reimbursement Provision in the Settlement Agreement. As recognized in *Zale,* parties cannot

accomplish through settlement what they cannot not attain directly – that is, bankruptcy court jurisdiction over the property.

Based upon the foregoing, this Court is constrained to respectfully observe that the Bankruptcy Court did not have jurisdiction to enjoin the Montana Claims.[17]

## VI.    Statutory Relationship

Turning to the next issue, the court finds that CNA has failed to demonstrate that the requisite statutory relationship exists pursuant to § 524(g)(4)(A)(ii)(III).

### A. Statutory Relationship

The Montana Claims may not be enjoined under the Channeling Injunction unless one of the four statutory relationships listed in § 524(g)(4)(A)(ii)(I)-(IV) is satisfied:

> [A]n injunction [under 11 U.S.C. § 524(g) ] may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—
>
> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; or

---

[17] This Court understands and respects that "it is axiomatic that on remand for further proceedings after decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." *Scarborough v. Chase Home Finance, LLC (In re Scarborough)*, Bankr. No. 01–35194ELF, Adv. No. 08–00058ELF, 2009 WL 2916971, at *3 (Bankr. E.D. Pa. Apr. 8, 2009). This court also understands that, even if the Third Circuit subsequently determines that the Bankruptcy Court did not have jurisdiction to enjoin the Montana Claims, it would be bound by principles of finality and res judicata, as discussed in *Bailey,* from reconsidering such decision, unless the Third Circuit reviewed such decision en banc.

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

Before the Bankruptcy Court, the parties disputed the meaning of the phrase "by reason of" stated prior to the four enumerated relationships listed in § 524(g)(4)(A)(ii)(I)-(IV). *Carr,* 900 F.3d at 138. CNA argued that liability arises "by reason of" one of the four enumerated relationships when that relationship is a "but for," factual cause of the third party's alleged liability. *Id.* at 138 n. 8. The Montana Plaintiffs argued that liability arises "by reason of" one of the four enumerated relationships when that relationship is a legal cause of, or a legally relevant factor to, the third party's alleged liability. *See W.R. Grace,* 2016 WL 6068092, at *11.

The Third Circuit noted that the Bankruptcy Court did not adopt either of the parties' interpretations. *Carr,* 900 F.3d at 138. Instead, the Bankruptcy Court held that, even under the Montana Plaintiffs' more stringent "legal consequence" standard, CNA had demonstrated that the insurance relationship between CNA and Grace was legally relevant to the Montana Claims because "[t]he basis for the alleged undertakings by CNA (*i.e.,* industrial hygiene services or inspections of Grace's facilities) arise wholly out of the insurance relationship." *Id.* (quoting *W.R. Grace,* 2016 WL 6068092, at *13).

The Third Circuit did "not disturb the bankruptcy court's assumption that CNA's provision of insurance to Grace must be a 'legally relevant factor' to its alleged liability." *Id.* However, the Third Circuit instructed this court to "review the applicable law to determine the relationship's legal relevance to the third-party's alleged liability." *Id.* Specifically, this court

53

"should examine the elements necessary to make the Montana Claims under the applicable law (here, state law), and determine whether CNA's provision of insurance to Grace is relevant legally to those elements." *Id.*

In vacating the Bankruptcy Court's holding with regard to the statutory relationship requirement, the Third Circuit clearly rejected CNA's argument that its insurance relationship with Grace was legally relevant to the Montana Claims merely because the industrial hygiene services and inspections performed by CNA arose entirely out of the parties' insurance relationship. Instead, the court will focus on whether CNA's provision of insurance to Grace is legally relevant to the elements of the Montana Claims.

### 1. *Quigley* Analysis

By way of background, in *Quigley*, the Second Circuit performed a comprehensive analysis of the statutory relationship requirement in § 524(g)(4)(A)(ii)(I)-(IV). *Quigley*, 676 F.3d at 58-62. It also initially focused on the phrase "by reason of" and found that there were several factors which favored adoption of the "legal consequence" position. *Id.* at 60.

At the outset, the Second Circuit deemed it significant that each of the four enumerated relationships "is of a sort that could, *legally*, have given rise to *actual* liability in appropriate circumstances prior to § 524(g)'s enactment" and "render[ed] an injunction appropriate." *Id.* Prior to § 524(g)(4)(A)(ii)(I), third-party claims that arose "by reason of" a third party's "ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor," which were the equivalent of claims based upon a "piercing the corporate veil" theory, could be enjoined. *Id.* Similarly, third party claims that arose "by reason of" a third party's "provision of insurance to the debtor or a related party"

referred to "statutory 'direct action' liability,'" which could be enjoined prior to the enactment of § 524(g)(4)(A)(ii)(III). *Id.*

Additionally, under § 524(g)(4)(A)(ii)(IV), claims which arose "by reason of" the third party's "involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party" could be enjoined "on an aiding and abetting theory, as when one party induces another to commit a tort... or on a successor liability theory, when a transaction results in the merger or consolidation of the two firms but 'the purchaser is a mere continuation of the seller,' or where 'the transaction was entered into fraudulently for the purpose of escaping liability.'" *Id.* (citations omitted).

## 2. Montana Law

This court must determine whether CNA's provision of insurance to Grace is legally relevant to the elements of either the Restatement or Common Law Standards. The elements under the Restatement only require performance of a service under a contract. There is no requirement that a defendant provide insurance in order for the defendant's duty to arise. In fact, none of the elements reference insurance at all. Likewise, under the Common Law Standards, none of the elements in either of the Common Law Standards reference the provision of insurance.

Under both the Restatement and Negligence Standards, liability is imposed on a third party, under certain circumstances, when the third party renders *services* to another. There is no requirement that such services relate to the provision of insurance. Under the Duty to Warn Standard, liability is imposed on a third party when the third party engages with a hazard, or is in a position with respect to foreseeable victims and a hazard. There is no requirement that the third party provide insurance in order for the duty to arise. CNA's provision of insurance to Grace has

no relevance to CNA's alleged liability to the Montana Plaintiffs under either the Restatement or the Common Law Standards. As a result, CNA has failed to demonstrate the requisite statutory relationship under § 524(g)(4)(A)(ii)(III).

## VII.    CONCLUSION

For the foregoing reasons, the Court finds that the Montana Claims do not satisfy the derivative liability and statutory relationship requirements in § 524(g)(4)(A)(ii) and, therefore, are not enjoined by the Channeling Injunction. As a result, CNA's Motion for Summary Judgment is hereby denied, and the Montana Plaintiffs' Cross-Motion for Summary Judgment is hereby granted.

Date: September 23, 2019

_____

Honorable Ashely M. Chan
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **W.R. GRACE & CO.,** *et al.,* | : | **Bankruptcy No. 01-1139 (AMC)** |
| | : | **(Jointly Administered)** |
| | : | |
| **DEBTORS** | : | |
| | : | |
| | : | |
| **CONTINENTAL CASUALTY CO.,** | : | |
| *et al.,* | : | |
| | : | |
| **PLAINTIFFS** | : | **Adv. Proc. No. 15-50766 (AMC)** |
| | : | |
| *v.* | : | |
| | : | |
| **JEREMY B. CARR,** *et al.,* | : | |
| | : | |
| **DEFENDANTS** | : | |

## <u>ORDER</u>

AND NOW, this 23rd day of September 2019, for the reasons stated in the accompanying

Opinion, the Montana Claims[1] do not satisfy the derivative liability and statutory relationship

requirements in § 524(g)(4)(A)(ii) and, therefore, are not enjoined by the Channeling Injunction,

and it is hereby ORDERED that:

1. CNA's motion for summary judgment is DENIED;

2. The Montana Plaintiffs' cross-motion for summary judgment is GRANTED; and

3. The Montana Plaintiffs are permitted to resume litigation of the Montana Claims in
   Montana state court.

_____
Ashely M. Chan
United States Bankruptcy Judge

---

[1] The terms referenced herein are given the same meaning as in the accompanying Opinion.